PLANTERS' BANK *v.* UNION BANK.

UNION BANK *v.* PLANTERS' BANK.

1. A military commander commanding the department in which the city of New Orleans was situate, had not the right, on the 17th of August, 1863, after the occupation of the city by General Butler, and after his proclamation of May 1st, 1862, announcing that "all the rights of property of whatever kind will be held inviolate, subject only to the laws of the United States," to seize private property as booty of war, or, in face of the acts of Congress of 6th of August, 1861, and July 17th, 1862, make any order as commander confiscating it.

2. Where after judgment for a certain sum a *remittitur* is entered as to part, the *remittitur* does not bind the party making it, if the judgment be vacated and set aside.

3. Where after judgment for a certain sum, execution is allowed, during a motion for a new trial, to issue for a part of the sum, which part is admitted to be due, this, though anomalous, is not a ground for reversal, where no objection appears to have been made, and where it may fairly be presumed that the defendant assented to what was done; and where, a new trial being afterwards granted, it was limited to a trial as to the excess of the claim above the amount for which the execution was issued.

4. A promise to pay in "Confederate notes" in consideration of the receipt of such notes and of drafts payable by them, is neither a *nudum pactum* nor an illegal contract.

5. Though an illegal contract will not be enforced by courts, yet it is the doctrine of this court that where such a contract has been executed by the parties themselves, and the illegal object has been accomplished, the money or thing which was the price of it may be a legal consideration between the parties for a promise express or implied, and that the court

will not unravel the transaction to discover its origin. The doctrine applied to the case of money received for the sale of " Confederate bonds."

6. Although, where *money* has been deposited with a bank, or drafts, &c., to be collected in *money*, and there has been no contract or understanding that a different rule should prevail, the bank where the deposit is made ordinarily becomes the owner of the money and consequently a debtor for the amount collected, and under obligation to pay on demand, not the identical money received, but a sum equal in legal value, yet this does not apply where the thing deposited was not *money*, but a commodity, such as " Confederate notes," and it was agreed that the collections should be made in like notes. The fact that the collecting bank used the notes in their business does not alter the case. The case distinguished from *Marine Bank* v. *Fulton Bank* (2 Wallace, 252).

Error to the Circuit Court for the District of Louisiana; the case being this:

On the outbreak of the rebellion of 1861, both the States of Tennessee and Louisiana joined in that movement; and while those two States were both under the control of the rebel powers, the Planters' Bank of Tennessee (at Natchez) remitted to the Union Bank of Louisiana (at New Orleans) large sums of " Confederate treasury notes," and also forwarded to it drafts and other claims for collection (and a few Confederate bonds for sale), it having been understood between the two banks that the drafts and claims thus forwarded for collection and the price of the bonds sent for sale were payable only in such Confederate currency, and all the collections made on account of the Planters' Bank having been made in that currency, with its knowledge and authority. In this way entirely a large balance was made up in favor of the Planters' Bank. There was no controversy as to these facts.

About the 1st of May, 1862, New Orleans was recaptured by the government forces and passed into their control. A large balance, in the course of dealings already mentioned, was at this time due the Planters' Bank.

On entering New Orleans, General Butler, the general who took possession of it for the United States, issued a proclamation, in which he declared:

"All the rights of property, of whatever kind, will be held inviolate, subject only to the laws of the United States."

On the 6th of August, 1861, Congress passed "An act to confiscate property used for insurrectionary purposes," &c., and on the 17th of July, 1862, "An act to suppress insurrection, to punish treason and rebellion, and for other purposes." These acts designated certain agents for seizing the property of rebels and prescribed certain judicial proceedings for the condemnation of it in the courts of the United States, when belonging to natural persons who were rebels, to persons who aided, abetted, and gave comfort to the rebellion, or who held office under the so-called Confederate States, or any State assisting to form them. But neither of the acts gave authority to military commanders to seize such property, nor did either make the property of any incorporated banks liable to such seizure.

In this state of things, an order was issued on the 17th of August, 1863, by command of Major-General Banks, then in command of the department, requiring the several banks and banking associations of New Orleans to pay over without delay to the Chief-Quartermaster of the army, or to such officer of his department as he might designate, all money in their possession belonging to, or standing upon their books to the credit of, *any corporation, association,* or pretended government in hostility to the United States, and all moneys belonging to, or standing on their books to the credit of, any person registered as an enemy of the United States, or engaged in any manner in the military, naval, or civil service of the so-called Confederate States, or who should have been or who might thereafter be convicted of rendering any aid or comfort to the enemies of the United States. The order declared that such funds would be held and accounted for by the quartermaster's department, subject to the future adjudication of the government of the United States. Under this order the Union Bank, as the evidence tended to show, on the 10th day of September, 1863, paid to the acting quartermaster the balance standing to the credit of the Planters' Bank on their books, being the

whole balance due. The payment was made in Confederate notes ($211,774) and the quartermaster accepted them in discharge of the balance.

On the 15th of the same September, 1863, the Planters' Bank drew on the Union Bank for $86,646, the sum in Federal money which it conceived to be due to it. The Union Bank refused to pay, alleging the seizure by General Banks and payment over accordingly. Thereupon—on the 11th of September, 1866—the Planters' Bank sued the Union Bank in the court below, to recover its alleged balance, with interest from the date of the demand. The defendant set up the facts of the case as above given, and that the Confederate moneys sent to the defendant by the Planters' Bank were issued and put in circulation by the said Confederate States during the rebellion for the purpose of maintaining and prosecuting the war, &c.; that the dealings of the plaintiff in the said currency were designed on its part to give, and did contribute to give circulation and credit to such unlawful issues, and that it, the defendant, was therefore not liable, on account of the receipt of such currency, to the plaintiff in manner and form as by it alleged.

The case came to trial in February, 1868, and the jury returned a verdict for the plaintiff for the amount claimed in full, with interest, $113,296.01, and a judgment was entered accordingly.

A motion for a new trial was then made, and while the same was undetermined and held under advisement, the following order was entered:

"On motion of the attorneys for plaintiff it is ordered that a *remittitur* of interest allowed in the judgment in this case be entered, except what is claimed as follows, &c."

On the same day the attorneys of the plaintiff, on the suggestion that the attorneys of defendant had, during the trial, admitted in presence of the jury that there was due to plaintiff $26,752.63, with interest from 25th November, 1863, asked that an execution be issued for this sum; and the

motion was granted " without prejudice to the plaintiff's right to recover the balance under the judgment in the case."

The motion for a new trial was ordered to be reargued, and after the reargument a new trial was granted, " excepting as regards the sum of $26,752.63, admitted by the defendant to be due to the plaintiff."

On the 24th of January, 1871, two years and ten months after this, the case was again submitted to the jury, and they being sworn to try the issues, the court, against the defendant's objection, permitted the plaintiff to withdraw his *remittitur.*

On this trial THE DEFENDANT requested the court to charge the jury—

"That the generals commanding the army of the United States, engaged in military operations against the rebels in the late civil war, had the legal power to seize and take possession of the property or effects of rebels, whenever in their judgment necessary or conducive to the successful prosecution of the war; that the commanding generals were the sole judges [subject alone to the control of their military superiors] of the necessity or expediency of such seizures, and that if the jury find from the evidence that the military authorities exacted payment of the balance on the books of the defendant to the credit of the Planters' Bank and its branches, then that the military authorities thus exacting payment were invested, as regards said payments, with all the rights of a creditor.

"That if the demand of the plaintiff arose from the receipt of the so-called Confederate notes, with the authority of the plaintiff, and the military authorities of the United States exacted payment of said demand [and accepted payment in Confederate treasury notes], and if the said payment was made accordingly to the said authorities under compulsion, and a receipt in full given for the amount so paid to them, then that the said payment and receipt are a valid acquittance and discharge of the defendant from any liability to the extent of such part of the demand of the plaintiff as arose from the receipt of the so-called Confederate treasury notes for account of the plaintiff with its authority."

The court did so charge, with the exception that it left out the important words in [   ]. It said:

" The jury will determine what the payment ought to have been. I consider that the military authorities had no right to transact with the defendant in this case; Confederate money was then almost worthless in the discharge of the debt due by the defendant to the Planters' Bank."

The defendant also asked the court to charge further:

" That if the balance of account sued for is composed, wholly or in part, of direct remittances from the plaintiff to the defendant of Confederate treasury notes to be placed to credit of the plaintiff, and of collections for their account of drafts, actually and in effect and intent, payable in Confederate treasury notes, remitted for collections by plaintiff to defendant, and by the latter collected for account of plaintiff in Confederate treasury notes, and that the banks were necessary instruments of the Confederate government in putting its issues of Confederate treasury notes in circulation and forcing them upon the country, and that the plaintiff, as one of the banks, willingly lent itself as the instrument of the Confederate government to put those issues in circulation, then, that the plaintiff cannot recover such amount of the balance thus composed of treasury notes and ' collections.'

" That no lawful or valid obligation can arise from the sale of bonds or securities of the Confederate government, and no action lies for the proceeds of such bonds."

But both these last two charges the court refused to give.

THE PLAINTIFF asked the court to charge—

" That if the jury find that the defendant received ' Confederate currency ' on behalf of the plaintiff and entered the same to the credit of the plaintiff on the books of his bank, and used the same in its general business, the defendant thereby became the debtor of the plaintiff, and the measure of the indebtedness is the value of ' Confederate currency ' in the lawful money of the United States, at the time the credit was entered as aforesaid and the collections were made."

But the court refused thus to charge, and charged:

" That the measure of indebtedness for receipts or collections

made by the defendant in 'Confederate currency,' and used by it in its general business, was the value of such currency at the date of demand of payment made by the plaintiff, and not at the date when such currency was received and used by defendant in its business."*

The jury found in favor of the plaintiff for $24,713, with interest from the 15th of September, 1863, and judgment was entered accordingly.

Both parties excepted,—

The defendant to the refusals of the court to charge as requested, to the allowance of a withdrawal of the *remittitur*, and to the order of the court ordering execution for the $26,752.63, before the motion for a new trial was determined;

The plaintiff to the refusal to charge as requested and to the charge as given.

[It should be added (in order to explain a part of the argument, and of the dissenting opinion in this case), that by acts of March 3d, 1863,† and the 11th of May, 1866,‡ Congress enacted that it should be " a defence in all courts, to any action pending or to be commenced," against any one for " a seizure" of property when it was shown that such seizure had been made under any " order . . . of any military officer of the United States holding the command of the department, district, or place in which such seizure was made."]

*Messrs. P. Phillips and Conway Robinson for the Union Bank, and in support of its assignment of errors:*

1. Had General Banks authority to issue the order under which the payment was made? If he had, it would clearly follow that he had the right to place his own construction on it, and to determine when and in what manner the debt should be paid, and his receipt for the amount would oper-

---

* The reader will, of course, understand that between the two dates mentioned here " Confederate currency " had largely diminished in market value.

† 12 Stat. at Large, 756, § 4.                    ‡ 14 Id. 46.

ate as complete a discharge of the debtor, as if it had been executed by the creditor himself.

He had the power to issue the order. He was in command of the department, and the only representative of the constitutional commander-in-chief. The order was issued while the war was flagrant. In the absence of any prohibitory act of Congress, or order from his superior, he was vested with the full power of doing all that the laws of war permitted. Whatever the chief executive could do in those portions of the country which had fallen by conquest under his dominion, he could do.

In a case before Lord Tenterden, in 1830, on appeal from the judgment of the Supreme Court of Bombay, it was shown that the property was seized in a recently conquered province, long after it had been conquered, at a distance from actual hostilities, and when courts of justice were exercising their authority.

His lordship said:

"We think the proper character of the transaction was that of hostile seizure made, if not *flagrante*, yet, *nondum cessante bello*, and consequently the municipal court had no jurisdiction to adjudge upon the subject; but if anything had been done amiss, recourse could only be had to the government for redress."*

The right of the conqueror to acquire title to possess and alienate both *immovable* and *incorporeal* property is treated of by Dr. Phillimore.† Speaking of the case of payment of a debt to a conqueror, subsequently to which the former sovereign is restored, he puts these questions:

"Has the restored government the right to demand of the debtor the payment which he has discharged during the *interregnum?* Does it follow that if this government had the right to exact the debt, *it was the debtor's duty to pay it?* Are the two propositions convertible? Or, if so, may not the original creditor demand a second payment?"

The author then quotes Bynkershoek, to the effect that

* Elphinstone *v.* Bedreechund, 1 Knapp, Privy Council, 360–1.
  Vol. 3, p. 396.

the debt is *satisfied and extinct;* and this, he says, is unquestionably the opinion of the greater number of the most able jurists; the conclusion from the analogies to be drawn from the Roman law, and the international practice as shown by treaties.

The order of General Banks has been approved by his government; his receipts have of course been accounted for by him. If, in the exercise of his power, "anything has been done amiss" (we use the language of Lord Tenterden), "recourse could only be had to the government for redress."

The government has passed laws protecting its military officers for acts done during the war. It has thus interposed itself in this case between the parties to the controversy. If the order was originally illegal, the government has protected the officer from suit. It has made his acts its own, and if wrong has been inflicted, the creditor can look only to the good faith of Congress.

The question whether *private debts* are properly subjected to seizure, has created much discussion. The case is often provided for by treaty. The 10th article of the treaty of 1794, with Great Britain,* declares they shall not be "confiscated or sequestered." The articles of "Camillus," written by Hamilton in vindication of this article,† show the violence with which the provision of the treaty had been attacked.

His vindication of the principles involved proceeds on the ground that whenever a government grants permission to a foreigner "to bring his property within its territory, it tacitly promises protection." How, he asks, can it be reconciled with the idea of a trust, to take the property from its owner, when he has personally given no cause for the deprivation?
Again,

"Where the persons or goods of an enemy are found in our country, there is a reliance upon our hospitality and justice; there is an express or implied safe conduct; the individuals and

---

\* 8 Stat. at Large, 122.
† Works of Hamilton, vol. 7, pp. 232, 233, 335.

their property are in the custody of our faith. To make them a prey' is therefore to infringe every rule of generosity and equity; it is to add cowardice to treachery."

The reason, therefore, for the denial of the right of such seizure between two independent governments on the breaking out of war, would seem to have no application to a war waged for the suppression of a rebellion, and we' may further add that notwithstanding the strong language of " Camillus," the decisions of this court are decidedly in favor of the right, even as between foreign nations.*

Payment to a usurped government such as that of the Confederates is held good on the principle of irresistible force.

This court lately decided† that the United States could not recover against one of its officers who had paid over to the Confederate authorities the amount due to the former, for the payment had thus extinguished the debt.

In the case before us it can make no difference whether the defendant held the plaintiff's funds on special or general deposit; in other words, whether as bailee or debtor. The order was not directed to obtain any property or funds of the defendant, but to obtain the property or funds of the plaintiff. To enforce now by judicial sentence a second payment from the defendant, is to shield him intended to be wounded, and wound the party intended to be shielded.

2. The order for a *remittitur* entered on the application of the plaintiff, was a confession of record, that the amount thus renounced was not due by the defendant. It was in the nature of a judgment, and the court had no power after the lapse of the term at which it was entered to set it aside. It is like a judgment on *retraxit*, which is as complete a bar as a judgment on verdict.‡

3. It was equally erroneous to order an execution for a part of the first judgment rendered while the motion for a new trial was pending and undisposed of. The defendant

---

* Brown *v.* United States, 8 Cranch, 110.

† United States *v.* Thomas, 15 Wallace, 337.

‡ Thomason *v.* Odum, 31 Alabama, 108.

was thus deprived of his writ of error and supersedeas, and was forced to pay the amount of this execution, as this was not a final judgment.

4. Can the dealing of these banks in Confederate notes and *bonds*, thus stimulating their circulation and enhancing their value, be the foundation of a valid contract enforceable in the courts of the United States?

The grounds of necessity which induced the court to declare that this currency constituted a sufficient consideration for a note in the case of *Thorington* v. *Smith** do not cover this case. There was certainly here no necessity for the purpose of maintaining social existence in the South, to deal in *bonds* given for the purpose of carrying on the rebellion, as there might have been in using the only money there, the Confederate notes.

*Mr. T. J. Durant, for the Planters' Bank, and in support of its assignment of error:*

The court below erred in charging the jury that the measure of indebtedness of the Union Bank to the Planters' Bank was the value of Confederate currency in National currency at the time the Planters' Bank demanded payment from the Union Bank, and not the value at the time the Union Bank received the Confederate currency and passed the amount thereof on its books to the credit of the Planters' Bank.

The exact matter was decided by this court in *Marine Bank* v. *Fulton Bank.†* There the latter bank, one of New York, had remitted to the former, a bank of Chicago, two notes for collection, which was made. About a year after the collection was made the New York bank made a demand of payment from the Chicago bank, which was refused unless the former bank would accept Illinois currency, at the time of demand of payment sunk in value to 50 per cent. below par.

In speaking of this collection, this court said:

"It was used by the bank in the same manner that it used

---

* 8 Wallace, 13.  † 2 Id. 256.

the money deposited with it that day by city customers, and the relation between the two banks was the same as that between the Chicago bank and its city depositors. It would be a waste of argument to attempt to prove that this was a debtor and creditor relation."

The features of this case are so analogous to the case now before us, and the reasoning of the court is so applicable throughout, that we only refer to other cases* to the same effect.

Mr. Justice STRONG delivered the opinion of the court.

Whether the payment in Confederate notes, and the quartermaster's acceptance of them in discharge of the balance, was a satisfaction of the claim of the plaintiffs upon the defendants is a controlling question in the case. The Circuit Court instructed the jury that it was not, because payment was made to the quartermaster in Confederate notes, which the court was of opinion he had no authority to receive, though holding that the military authorities thus exacting payment were invested with all the rights of a creditor.

It might be difficult to maintain, if the military authorities were clothed with the rights of creditors, that is, if they had succeeded to the position and title of the plaintiffs, that they could not determine what funds they would receive in payment of the balance on the defendants' books to the credit of the plaintiffs. It is not perceived why they could not accept Confederate notes in discharge of a debt which had become due to them. But a grave question lies back of this. Did the order of General Banks justify any payment of the balance to the military authorities? If it did not, it is immaterial in what currency the payment was made. Payment in any currency was no protection to the debtors. The validity of the order is, therefore, the first thing to be considered. It was made, as we have seen, on the 17th of

---

* Commercial Bank of Albany *v.* Hughes, 17 Wendell, 100; Foley *v.* Hill, 2 House of Lords Cases, 36; Carr *v.* Carr, 1 Merivale, 541, *note;* Sims *v.* Bond, 5 Barnewall & Adolphus, 389.

August, 1863.   Then the city of New Orleans was in quiet possession of the United States forces.   It had been captured more than fifteen months before that time, and undisturbed possession was maintained ever after its capture.   Hence the order was no attempt to seize property "*flagrante bello,*" nor was it a seizure for immediate use of the army.   It was simply an attempt to confiscate private property which, though it may be subjected to confiscation by legislative authority, is, according to the modern law of nations, exempt from capture as booty of war.   Still, as the war had not ceased, though it was not flagrant in the district, and as General Banks was in command of the district, it must be conceded that he had power to do all that the laws of war permitted, except so far as he was restrained by the pledged faith of the government, or by the effect of Congressional legislation.   A pledge, however, had been given that rights of property should be respected.   When the city was surrendered to the army under General Butler, a proclamation was issued, dated May 1st, 1862, one clause of which was as follows: "All the rights of property of whatever kind will be held inviolate, subject only to the laws of the United States."   This, as was remarked in the case of *The Venice,*\* "only reiterated the rules established by the legislative and executive action of the National government in respect to the portions of the States in insurrection, occupied and controlled by the troops of the Union."   That action, it was said, indicated the policy of the government to be, not to regard districts occupied and controlled by National troops as in actual insurrection, or their inhabitants as subject, in most respects, to treatment as enemies.

Substantial, complete, and permanent military occupation and control was held to draw after it the full measure of protection to persons and property consistent with a necessary subjection to military government.   We do not assert that anything in General Butler's proclamation exempted property within the occupied district from liability to confis-

* 2 Wallace, 258.

cation as enemies' property, if in truth it was such. All that is now said is that after that proclamation private property in the district was not subject to military seizure as booty of war. But admitting, as we do, that private property remained subject to confiscation, and also that the proclamation applied exclusively to inhabitants of the district, it is undeniable that confiscation was possible only to the extent and in the manner provided by the acts of Congress. Those acts were passed on the 6th of August, 1861, and on the 17th of July, 1862. No others authorized the confiscation of private property, and they prescribed the manner in which alone confiscation could be made. They designated government agents for seizing enemies' property, and they directed the mode of procedure for its condemnation in the courts. The system devised was necessarily exclusive. No authority was given to a military commandant, as such, to effect any confiscation. And under neither of the acts was the property of a banking institution made confiscable. Both of them had in view the property of natural persons who were public enemies, of persons who gave aid and comfort to the rebellion, or who held office under the Confederate government, or under one of the States composing it. In no one of the six classes of persons whose property was by the act of 1862 declared subject to confiscation was an artificial being included. It is, therefore, of little importance to inquire what, under the general laws of war, are the rights of a conqueror, for during the recent civil war the government of the United States asserted no general right in virtue of conquest to compel the payment of private debts to itself. On the contrary it was impliedly disclaimed, except so far as the acts of 1861 and 1862 asserted it. Those enactments declaring that private property belonging to certain classes of persons might be confiscated, in the manner particularly described, are themselves expressive of an intent that the rights of conquest should not be exercised against private property except in the cases mentioned, and in the manner pointed out. And it is by no means to be admitted that a conquering power may compel private debtors to pay

their debts to itself, and that such payments extinguish the claims of the original creditor. It does indeed appear to be a principle of international law that a conquering state, after the conquest has subsided into government, may exact payment from the state debtors of the conquered power, and that payments to the conqueror discharge the debt, so that when the former government returns the debtor is not compellable to pay again. This is the doctrine stated in Phillimore on International Law,[*] to which we have been referred. But the principle has no applicability to debts not due to the conquered state. Neither Phillimore nor Bynkershoeck, whom he cites, asserts that the conquering state succeeds to the rights of a private creditor.

It follows then that the order of General Banks was one which he had no authority to make, and that his direction to the Union Bank to pay to the quartermaster of the army the debt due the Planters' Bank was wholly invalid. This makes it unnecessary to consider in detail the exceptions taken by the defendants to the rulings of the Circuit Court, respecting the order and the alleged payment under it; for if the order was invalid, payment to the quartermaster did not satisfy the debt.

It is further assigned for error by the defendants, that the court allowed the plaintiffs to withdraw a *remittitur* entered by them of part of a verdict obtained on a former trial of the case. The only objection made in the court below to the allowance was, that the *remittitur* was an acknowledgment of record that the amount remitted was not due. There had been a former trial in which the plaintiffs had obtained judgment for $113,296.01, with five per cent. interest from November 25th, 1863. This was a larger amount of interest than the petition of the plaintiffs had claimed, and they entered on the judgment a *remittitur* of the excess, expressly reserving their rights to the balance of the judgment. Subsequently a new trial was granted, and it is now con-

---

[*] Vol. 3, part 12, ch. 4.

tended that the *remittitur* had the effect of a *retraxit*. As it was entered after judgment, such would perhaps be its effect if the judgment itself had not been set aside and a new trial had not been granted.* But such cannot be its operation now. If it takes effect at all it must in its entirety, and the plaintiffs must hold their first judgment for the balance unremitted. As that judgment no longer exists, there is no reason for holding that the remission of a part of it is equivalent to an adjudication against them. This assignment of error is, therefore, not sustained.

Another error assigned by the defendants is, that the court ordered execution to issue on the judgment first recovered for the sum of $26,752.63, without prejudice to the plaintiffs' rights to recover the balance, that amount having been admitted to be due, and that this was done before the motion for a new trial was disposed of. It must be admitted that though there was a judgment in existence, the order of an execution at the time it was made was anomalous. But there does not appear to have been any objection to it, and it is not shown that the defendants have sustained any injury in consequence of its issue. It may fairly be presumed that the defendants assented to the order, and admitted that the sum for which the execution was directed was due. The new trial afterwards granted was limited to the controversy respecting the excess of the claim over $26,752.63, which, as the order stated, "was admitted by the defendants to be due the plaintiffs."

The only remaining errors assigned by the defendants which require notice, grow out of the refusal of the court to charge the jury as requested, that if they found the balance of account sued for was composed wholly or in part of direct remittances from the plaintiffs to the defendants of Confederate treasury notes, and of collections of drafts payable and paid in such notes, and if they found that the banks were necessary instruments of the Confederate government

---

* Bowden v. Horne, 7 Bingham, 716.

for putting its issues of Confederate notes in circulation and forcing them upon the country, and that the plaintiffs, as one of the banks, willingly lent itself as an instrument of that government, then the plaintiffs could not recover such amount of the balance thus composed of treasury notes and collections.   The point, it will be observed, does not assume that the plaintiffs were willing agents, or agents at all of the Confederate government in putting into circulation the notes which went to make up the balance of account standing to their credit.   It assumes only that they had, as such agents, put some of the issues of the government into circulation, at some time, in some transaction with some person, not necessarily the defendants.   That assumption, had it been sustained by the finding of the jury, was wholly impertinent, and therefore the only relevant question presented by the point was, whether Confederate treasury notes had and received by the defendants for the use of the plaintiffs were a sufficient consideration for a promise, express or implied, to pay anything.   After the decision in *Thorington* v. *Smith* the point could not have been affirmed.   A promise to pay in Confederate notes, in consideration of the receipt of such notes and of drafts payable by them, cannot be considered a *nudum pactum* or an illegal contract.

Nor should the court have charged that, in the circumstances of this case, no action would lie for the proceeds of the sales of Confederate bonds which had been sent by the plaintiffs to the defendants for sale, and which had been sold by them, though the proceeds had been carried to the credit of the plaintiffs and made a part of the accounts.   It may be that no action would lie against a purchaser of the bonds, or against the defendants on any engagement made by them to sell.   Such a contract would have been illegal.   But when the illegal transaction has been consummated; when no court has been called upon to give aid to it; when the proceeds of the sale have been actually received, and received in that which the law recognizes as having had value; and when they have been carried to the credit of the plaintiffs, the case is different.   The court is there not asked to enforce

an illegal contract. The plaintiffs do not require the aid of any illegal transaction to establish their case. It is enough that the defendants have in hand a thing of value that belongs to them. Some of the authorities show that, though an illegal contract will not be executed, yet, when it has been executed by the parties themselves, and the illegal object of it has been accomplished, the money or thing which was the price of it may be a legal consideration between the parties for a promise, express or implied, and the court will not unravel the transaction to discover its origin. Thus, in *Faikney* v. *Reynous*,[*] a plaintiff was allowed to recover in an action on a bond given by a partner to his copartner for differences paid in a stockjobbing transaction prohibited by act of Parliament. This was the case of an express agreement to pay a debt which could not have been recovered of the firm. *Petrie* v. *Hannay*[†] was a similar case, except that the partner plaintiff had paid the differences by a bill on which there had been a recovery against him, and his action against his copartner for contribution was sustained. This was an action on an implied promise. *Ex parte Bulmer*[‡] goes much farther, and perhaps farther than can now be sustained. We are aware that *Faikney* v. *Reynous* and *Petrie* v. *Hannay* have been doubted, if not overruled, in England, but the doctrine they assert has been approved by this court.[§] *Lestapies* v. *Ingraham*[||] is full to the same effect. We think, therefore, the court was not in error in refusing to affirm the defendants' points.

No more need be said respecting the exceptions taken and errors assigned by the defendants below. None of them are sustained.

A single assignment of error made by the plaintiffs below remains to be considered. At the trial they asked for the following instruction: "If the jury should find from the

---

[*] 4 Burrow, 2069.          [†] 3 Term, 419.          [‡] 13 Vesey, 316.

[§] Armstrong *v.* Toler, 11 Wheaton, 258; McBlair *v.* Gibbes, 17 Howard, 236; Brooks *v.* Martin, 2 Wallace, 70.

[||] 5 Barr, 71; see also Farmer *v.* Russell, 1 Bosanquet & Puller, 296.

evidence that the defendants received Confederate currency on behalf of the plaintiffs, and entered it to the credit of the plaintiffs on the books of the bank, and used it in their general business, the defendants thereby became the debtors of the plaintiffs, and that the measure of the indebtedness was the value of Confederate currency in the lawful money of the United States at the time the credit was entered and the collections were made." This instruction the court declined giving, but in lieu thereof charged the jury that the measure of indebtedness for receipts, or collections, made by the defendants in Confederate currency and used by them in their general business, was the value of such currency at the date of demand of payment made by the plaintiffs, and not at the date when such currency was received and used by the defendants in their business. This refusal to instruct the jury as requested and the instructions actually given are now complained of as erroneous. We think, however, they were correct in view of the assumed and conceded facts. We do not controvert the position that generally a bank becomes a debtor to its depositor by its receipt of money deposited by him, and that money paid into a bank ceases, to be the money of the depositor and becomes the money of the bank which it may use, returning an equivalent when demanded, by paying a similar sum to that deposited. Such is undoubtedly the nature of the contract between a depositor and his banker. So also a collecting bank ordinarily becomes the owner of money collected by it for its correspondent, and consequently a debtor for the amount collected, under obligation to pay on demand, not the identical money received, but a sum equal in legal value.

But it is to be observed this is the rule where *money* has been deposited, or collected, and when there has been no contract or understanding that a different rule should prevail. The circumstances of the present case are peculiar. It seems to have been conceded in the court below that the deposits were made in Confederate currency, and that the collections were made in like currency with the assent of the plaintiffs. The instructions asked of the court assume this.

The Union Bank then became the agent of the plaintiffs to receive and to collect, not money, but Confederate notes, or promises, and the obligation it assumed was to pay Confederate notes when they should be demanded.   The subject of the contract was a commodity, not money, and there was no default in the Union Bank until a demand was made and refused.   And from the nature of the transaction it is to be inferred that the intent of the parties was that the one should impose and the other assume only a liability to return to the plaintiffs notes of the Confederate government like those received, or collected; notes promising to pay a like sum. And it is not perceived that the effect of the assumption is changed by the fact that the defendants used the notes received in their general business, if they did use them, prior to any demand for the fulfilment of their undertaking.   Such use was in contemplation of the parties from the beginning. In *Robinson* v. *Noble's Administrators,** a promise to pay in Cincinnati at a certain time, "in the paper of the Miami Exporting Company, or its equivalent," was held by this court to impose upon the promisor only a liability to make good the damages sustained through his failure to pay at the day, and that those damages were measured by the market value of the paper at the time when payment should have been made.   The promise was assimilated to an engagement to deliver a certain quantity of flour, or any other commodity, on a given day.   A loan for consumption to be returned in kind contemplates a restoration not of the identical thing loaned, but of a similar article equal in quantity, and if no return be made, all that the lender can require is the value of the thing which should have been returned at the time when the contract was broken.   The value at the time of the loan is not to be considered.   Both parties take the risk of appreciation or depreciation.   Why should not a similar rule be applied to the present case?   Ought the plaintiffs to recover more than the damages they have sustained from the breach of the contract?   Ought they to be

---

* 8 Peters, 181.

placed in a better position than that they would occupy if the defendants had paid them the right quantity of Confederate notes when they were demanded? We think not. Clearly if the notes had appreciated after they were received by the defendants, and before the demand was made, the plaintiffs would have been entitled to the benefit of the appreciation. This is because of the nature of the transaction, and it would seem, for the same reason, the risk of depreciation was necessarily theirs.

This case differs very materially from *Marine Bank* v. *Fulton Bank*.* There, it is true, the collecting bank received depreciated currency of the Illinois banks, and, it may be assumed, with the assent of its correspondent. But there were positive instructions to hold the avails of the collections subject to the order of the bank which had sent the notes for collection; and the proceeds of the collections were an authorized lawful currency. The two banks, therefore, stood to each other in the relation of debtor and creditor, and the collecting bank acknowledged that relation immediately on the payment of the notes which had been sent to it for collection. Not so here. The collections were not made in money, and it was not the understanding of the parties that money should be paid. We hold, therefore, that the Planters' Bank ought not to be permitted to recover more than the damages sustained by it in consequence of the defendant's failure to deliver Confederate notes when they were demanded, and those damages are measured by the value of those notes in United States currency at the time when the demand was made and when the notes should have been delivered; and in so holding we do not intend to deny or qualify the doctrine asserted in *Marine Bank* v. *Fulton Bank*, or in *Thompson* v. *Riggs*.† It follows that the charge given to the jury was correct.

There is, then, nothing in the record complained of by either party which would justify our ordering a new trial.

JUDGMENT AFFIRMED.

* 2 Wallace, 252.                    † 5 Wallace, 663.

Mr. Justice BRADLEY, dissenting.

I dissent from the judgment of the court in this case. The officer in command of the armies of the United States, after the possession of New Orleans had been secured, required debtors in New Orleans of creditors in the enemy's lines to pay such debts to the proper receiving officer of the army. That the debts due from the citizens of a belligerent state to the citizens of the state with whom the former is at war may be confiscated is undoubted international law. If such confiscation is, in fact, made by the military authorities, and if the action of those authorities is assumed or confirmed by the sovereign authority, the confiscation is perfect.

In this case the acts of the military authorities have been substantially adopted and confirmed by the Federal government in passing a law exempting military officers from all actions and suits for any acts done in their military capacity.

By this act, if any wrong was done, the government assumes it and holds itself responsible to the injured party, if any illegality occurred.

One party must suffer in this case, either the debtor or the creditor; and, as the debtor was compelled to pay the debt to the military authorities it ought not to be compelled to pay it over again to the creditor. Let the creditor apply to the Federal government for relief, by which the acts of the military authorities have been, in effect, assumed and confirmed.

In my judgment, such a disposition of the case would better accord with the principles of international law and the mutual rights and relations of all the parties concerned.