Joseph VATTEROTT,
Plaintiff-Respondent,

v.

GRYDER MOTORS, INC.,
Defendant-Appellant.

No. 9936.

Missouri Court of Appeals,
Springfield District.

March 12, 1976.

Motion for Rehearing and to Transfer
Denied April 5, 1976.

Application to Transfer Denied
June 14, 1976.

---

Richard E. Schwartz, Nangle & Schwartz, St. Louis, for defendant-appellant.

Charles T. Smallwood, Williams & Smallwood, Rolla, for plaintiff-respondent.

Before BILLINGS, C. J., and TITUS and FLANIGAN, JJ.

FLANIGAN, Judge.

Plaintiff-respondent Joseph Vatterott ("Joseph") brought this action against Gryder Motors, Inc. ("Gryder"), defendant-appellant.[1] Joseph had placed a 1971 GMC truck (Ident. No. DH92A–A173894) in the possession of Gryder, a car dealer, in order that Gryder might locate a purchaser. In March 1972, Gryder "sold" the truck to H. J. & W., Inc. and received from that corporation $20,500 representing the purchase price. Upon Gryder's refusal to pay Joseph any of the proceeds, this action was instituted.

The petition alleged, in general, that Joseph had placed the truck with Gryder and had authorized Gryder "to sell said motor vehicle for the sum of $17,500"; that Gryder sold the truck but failed to pay plaintiff; that the sale was illegal "in that plaintiff remains in possession of the certificate of title"; that Gryder made the sale knowing it was illegal.

The trial court, sitting without a jury, found the issues in favor of Joseph and awarded him $17,500. Gryder appeals.

Gryder's first point is, in essence, that Joseph was not entitled to judgment for the reason that he was not the real party in interest. Gryder claims that the owner of the truck, for whom Gryder acted as selling agent, was Thomas Vatterott ("Thomas"), son of Joseph. Gryder filed a third party petition against Thomas but could not obtain service on him. Thomas did not testify. Thomas was indebted to Gryder and the latter's refusal to pay any of the proceeds to Joseph was influenced by that fact, Gryder's position being that it was entitled to collect Thomas' debt out of the proceeds.

The background facts are that Thomas, in January 1971, purchased two trucks in Nebraska and received, for each, a Nebraska certificate of title. He mortgaged both trucks to General Motors Acceptance Corporation ("GMAC"). Thomas failed to maintain his mortgage payments and GMAC threatened foreclosure. On April 22, 1971, Joseph, at Thomas' request, obtained a loan, paid off GMAC, acquired physical possession of both trucks, received the two title certificates, and, according to his testimony, "assumed ownership of the trucks."

Joseph tried, without success, to sell the trucks. Thomas told Joseph that Gryder could sell them. At the instance of Joseph, Thomas and an employee of Joseph drove the trucks to Gryder's place of business at Rolla, Missouri, and delivered them to Gryder.

Gryder sold the first truck, the arrangement being that Gryder would receive, as its commission, the amount by which the purchase price exceeded $18,000. On January 3, 1972, Joseph met Gryder's president, Cordial Gryder ("Cordial"), at the Mark Twain Bank (from which Joseph had obtained a loan to pay off the indebtedness to GMAC). The transaction involving the first truck was consummated. Joseph delivered the certificate of title to that vehicle to Cordial and received from him a cashier's

---

1. A second defendant was Cordial Gryder, president of the corporate defendant. It was Joseph's testimony that he did not know whether Cordial "operates as an individual or as a corporation." Cordial testified that he acted "strictly as an officer of the corporation . . . and not in my individual capacity." At the close of the evidence the trial court, on Cordial's motion, dismissed the action as to him. Neither side questions the propriety of that ruling.

check for $18,000 which was applied on Joseph's debt to the bank. Joseph testified that the check was made payable to him, "either me or to the bank to apply on my account."

Cordial and Joseph then discussed the second truck, the one involved here. Cordial told Joseph that he did not think he could "get the same amount" for "your" second truck as he did for the first. According to Joseph, "we talked in numbers of $17,500, that was the amount he was going to pay me" and any "money above that" would be Gryder's.[2] Joseph authorized the sale of the second truck on that basis. Joseph told Cordial that he would furnish the title to the second truck "upon the sale and upon delivery of money." At the trial Joseph testified he was still "ready, able and willing to do that."

Joseph also testified that at all times he or his attorney had been in possession of plaintiff's Exhibit 1, which was certificate of title No. 1–D 9408, the Nebraska title to the second truck. Exhibit 1 was issued to Thomas on January 21, 1971, and showed Thomas to be the owner. It also showed the GMAC chattel mortgage and the discharge of that lien on April 23, 1971. The reverse side of Exhibit 1 contains a form entitled "Assignment of Certificate of Title." That assignment bears the signature of Thomas, together with the jurat of a notary public showing that it was subscribed and sworn to on July 26, 1971.[3] The name of Joseph appears as the assignee or buyer from Thomas. Joseph testified that Thomas signed it at Joseph's attorney's office, "and I don't know what date it was, excepting what's on this title, and it's notarized."

Gryder introduced testimony to the effect that Joseph gave his deposition in April 1974; that Exhibit 1 was produced at that deposition; that at that time the assignment form on it contained the signature of Thomas, but the space for the name of the assignee was left blank and it bore no jurat. Thus, argues Gryder, although the assignment on Exhibit 1 appears to have been executed on July 26, 1971, it was in fact not filled in until some time after the April 1974 deposition.[4]

Neither side invoked Rule 73.01(1)(b) V.A.M.R. to request findings of fact or grounds for the trial court's decision. Under that rule "[a]ll fact issues upon which no specific findings are made shall be con-

2. For Gryder, Cordial testified that Gryder claimed "no ownership" in the second truck, that Gryder was "merely an agent for the purpose of selling that vehicle."

3. As stated earlier in the opinion, Joseph testified that he obtained possession of the trucks and their title certificates on April 22, 1971.

The following language appears in *Pearl v. Interstate Securities Co.*, 357 Mo. 160, 165, 206 S.W.2d 975, 978 (1947): "Plaintiff had lawful possession of the cars and the title certificates because the owners intended for him to have them; and this gave him an enforceable right of possession against third parties with no right thereto. *Rankin v. Wyatt*, supra. The parties intended the transaction to be an actual bona fide sale and plaintiff had paid the full purchase price. He could have completed compliance with Section 8382 so as to have title vested in him by writing in his name as assignee and getting a notary to take the acknowledgments of his assignors. See *Crawford v. General Exchange Ins. Corporation*, Mo.App., 119 S.W.2d 458. Certainly he had acquired a sufficient equitable interest to have had the right to compel his assignors to complete the transfer of legal title to him, unless they saw fit to return the purchase price and rescind the sale. See *Boyer v. Garner*, Mo.App., 15 S.W.2d 893; *Riss & Co. v. Wallace*, [350 Mo. 1208, 171 S.W.2d 641,] supra. The evidence, including the testimony of one of his vendors, shows that they claimed no rights against plaintiff. Therefore, he had lawful possession of the cars under a claim of right."

Section 8382 is now § 301.210 V.A.M.S. As to the applicability of § 301.210 to a sale in Missouri of a vehicle titled in another state, see *Fawley v. Bailey*, 512 S.W.2d 477, 479[1] (Mo.App.1974) and *Lebcowitz v. Simms*, 300 S.W.2d 827 (Mo.App.1957).

4. The April 1974 deposition was not offered into evidence. There was no showing that, at the time that deposition was taken, the certificate of title was marked for identification or attached to the deposition or described in the deposition. See Rule 57.03(g) V.A.M.R. Gryder's present counsel did not represent it at the deposition or at the trial.

sidered as having been found in accordance with the result reached." Rule 73 requires this court to give due regard "to the opportunity of the trial court to have judged the credibility of witnesses."

■ Gryder's first point hinges upon the credibility of its evidence with regard to the date of the execution of the assignment on Exhibit 1. The trial court believed Joseph's evidence on that factual issue and its judgment, in that regard, is not "clearly erroneous." *Farmers Alliance Mut. Ins. Co. v. Reed*, 530 S.W.2d 470, 477[4] (Mo.App.1975). Accordingly, Gryder's first point has no merit.

Gryder's second point is that the trial court erred "in ruling that an agency relationship existed between the plaintiff and defendant or that a contract of sale on behalf of plaintiff was concluded by the defendant as the sale price was never agreed to."

■ The lack of factual support for this point invalidates it. As has been seen, Joseph testified that he authorized the sale of the second truck on the basis of $17,500 net to Joseph, the "money above that" to be Gryder's for acting his selling agent. Gryder admitted receiving $20,500 for the second truck. There was testimony that Cordial called Thomas and said "Tell your dad I've got his truck sold." Again, the trial court made no specific finding of fact on this issue but apparently it believed the evidence of Joseph. Its judgment, in that regard, is not clearly erroneous.

Gryder's third point is that the sale between Joseph and "the buyer who had paid [Gryder] for the truck" was "void under § 301.210 V.A.M.S." (dealing with motor vehicle sales and transfers) and that "the court erred in entering an order for specific

performance under a contract which did not exist."

So far as the transcript reflects, Gryder's purchaser, H. J. & W., Inc., has not received title to the second truck, although the evidence shows that Joseph is still "ready, able [5] and willing to furnish title." Why H. J. & W., Inc. parted with $20,500 without receiving record title to the second truck may ignite curiosity, but the transcript affords no explanation.

Indeed Gryder, asserting as its shield that the Joseph-H. J. & W., Inc. transaction is tainted, confessed its own misdoing. Cordial admitted that H. J. & W., Inc. made application for a Missouri title to the second truck, that the application (plaintiff's Exhibit 5) made no mention of the Nebraska title (although that information was called for by the form) and that he, on behalf of Gryder, executed on that application a certificate to the effect that "the facts herein are true." Cordial admitted that the certification was false.

But the instant controversy is not one between Joseph and H. J. & W., Inc. The latter is not a party and its legal position is not under review.

If Joseph's evidence is to be believed, and the trial court was not clearly erroneous in believing it, the transaction with H. J. & W., Inc. would have been completed in compliance with the applicable statute had Gryder not attempted to extract from the sale proceeds the debt owed it by Thomas.

■ Gryder has never claimed ownership of the truck and yet it is in possession of $20,500 paid it by H. J. & W., Inc. Joseph, who contributed no blight to the transaction with H. J. & W., Inc., is without a truck and without his share of the proceeds. It would be anomalous, if not outrageous, if this situation were permitted to stand.

---

**5.** In *Manchester Ins. & Ind. Co. v. State Farm Mut. Auto. I. Co.*, 460 S.W.2d 305 (Mo.App. 1970) the following appears at p. 307:

"This leads us to the second link in the ownership claim: Did Dreier reassign the Chrysler title certificate to Charles Cash? If so, ownership passed immediately to Cash even though there is no evidence he applied for a new title

certificate in his name. Such new certificate when issued 'is merely evidence of the title which the buyer has previously acquired by virtue of the assignment and transfer to him of the original certificate.' *Crawford v. General Exchange Ins. Corporation*, Mo.App., 119 S.W.2d 458[1–4]."

Whether or not Gryder's attack upon the validity of the Joseph-H. J. & W., Inc. transaction possesses plausibility, the law concerns itself more with what is right than with what may have the ring of logic.

It is neither necessary nor proper for this court to adjudicate the legality or illegality of the Joseph-H. J. & W., Inc. transaction, but even if it was illegal, the judgment of the trial court is not lacking in jurisprudential support.

The following language appears in 67 Am.Jur.2d Sales § 55, p. 168: "An agent is obligated to account to his principal for money or property belonging to his principal even though it was received in connection with an illegal transaction. This rule is generally applied to money or property received in connection with an illegal agreement to sell goods or an illegal sale of goods. Accordingly, although the seller cannot recover the price from the buyer if the sale is illegal, still if the buyer should pay the price to the seller's agent, it is generally held that the seller may recover from the latter the amount so paid, for the reason that the implied agreement of the agent to pay over the money to the seller is not a part of the illegal sale, but is a disconnected and independent contract or liability."

In 3 Am.Jur.2d Agency § 217, p. 591, the following language appears: "An agent who has received money or property belonging to his principal will not be heard to say that the principal received the money in an illegal transaction, or that the contract of agency was illegal, or that the principal engaged in business illegally. In such a case, the view has been taken that an agent receiving funds from an illegal contract is a mere depositary receiving the money for the principal."

And in 15 Williston on Contracts, 3d Edition, § 1785, p. 337 it is said: . . . "[M]isappropriation or embezzlement by an agent cannot be permitted although the agent with his principal's authority was engaged in an unlawful enterprise. . . . There is a clear distinction between an illegal contract and enforcing a duty not springing wholly from the contract but arising from the receipt of moneys which in good faith belong to (the principal)."

"One cannot make a shield of a void contract to rob an associate." *Lasswell Land Co. v. Wilson,* 236 F. 322, 330 (C.A.8, Mo.1916).

See also *Twiehaus v. Rosner,* 362 Mo. 949, 245 S.W.2d 107, 114[10] (1952); *Hobbs v. Boatright,* 195 Mo. 693, 724, 93 S.W. 934, 938 (1906); Rest. Agency § 412;[6] Rest. Trusts § 422; *Catts v. Phalen,* 2 How. (U.S.) 376, 11 L.Ed. 306; *Planters' Bk. v. Union Bk.,* 16 Wall. (U.S.) 483, 21 L.Ed. 473. *Allen v. Forbis,* 186 F. 276 (C.A.9 1911); *La Vaud v. Reilly,* 295 N.Y. 280, 67 N.E.2d 242 (1946); *Norton v. Blinn,* 39 Ohio St. 145; *Smith v. Blachley,* 188 Pa. 550, 41 A. 619 (1898); *Hertzler v. Geigley,* 196 Pa. 419, 46 A. 366 (1900); *Baldwin v. Potter,* 46 Vt. 402;[7] 3 C.J.S. Agency § 313, p. 109.

Another point raised by Gryder rests on the soundness of its third point and, the

---

6. The Restatement contains this remarkable illustration: "At the request of T, and upon T's promise to pay him therefor, P murders B. After P's apprehension for the crime, he employs A to obtain the promised money from T, and A so obtains it. A is under a duty to deliver this to P."

Fortunately no need exists to determine whether Missouri would carry the principle so far.

7. Where a person employed another to make sales of candy by a scheme which was violative of the law prohibiting lotteries, and in a suit by the principal against the agent for the money so received the agent pleaded the illegality of the transaction by which he obtained the mon-

ey. It was held that the action would lie, the court saying: "The defendant (the agent) insists that, inasmuch as the plaintiff could not have enforced the contracts of sale as between himself and the purchaser, therefore, as the purchaser has performed the contracts by paying the money to the plaintiffs through me, as their agent, I can now set up the illegality of the contract of sale to defeat an action brought to enforce a contract on my part to pay the money that I as agent received, over to my principal. In other words, because my principal did not receive the money on a legal contract, I am at liberty to steal the money, appropriate it to my own use, and set my principal at defiance. We think the law is well settled otherwise."

latter having been rejected, requires no discussion.

■ The judgment must be affirmed, but with one modification. The body of the judgment includes the language "and the court at the close of all the evidence finds the issues for the plaintiff and against the defendant Gryder Motors, Inc., and enters judgment for $17 500 *upon delivery of assigned title in evidence as Plaintiff's Exhibit No. 1.*"

The italicized portion must be deleted. It may be regarded as surplusage rather than as a condition which might undermine the finality of the judgment and destroy its appealability. See *Thompson v. Hodge,* 348 S.W.2d 11 (Mo.App.1961) and *Burger v. Burger,* 481 S.W.2d 632 (Mo.App.1972). This is so because the exhibit (with the consent and in fact the tender of Joseph) was under the control of the trial court and is now on file here. If it was a valid condition, its fulfillment is at hand. But the delivery of the exhibit, standing alone, and whether to Gryder or someone else, would be an idle gesture. The utilization of it would result at most in the issuance of a new title to Joseph, an achievement, without more, of no significance to Gryder. Moreover, Gryder at no time has requested such relief. The italicized portion, being surplusage, "may be disregarded, leaving the remainder of the judgment standing." *Kennedy v. Boden,* 231 S.W.2d 862, 866 (Mo.App.1950). See also *Continent Foods Corp. v. National-Northwood, Inc.,* 470 S.W.2d 315 (Mo.App.1971).

The judgment, so modified, is affirmed.

All concur.