The Western Union Telegraph Company *v.* The Union Pacific Railway Company and others.

*(Circuit Court, D. Kansas.* July 27, 1880.)

1. CORPORATION—POWER TO ASSIGN FRANCHISE UNDER ACT OF CONGRESS OF JULY 2, 1864.—The United States Telegraph Company had power to assign and transfer to plaintiff its right, derived from act of congress of July 2, 1864, to construct a line of telegraph along the line of the Kansas Pacific Railroad, and the amended bill shows that such assignment was duly executed.

2. ILLEGAL CONTRACT DOES NOT AFFECT PREVIOUSLY-ACQUIRED INTEREST IN SAME PROPERTY.—Where, prior to October 1, 1866, the plaintiff had acquired an interest in the telegraph line and property in controversy, that interest was not affected by a contract made on that day for a lease of the line, even though that contract be held void.

8. SAME—PROPERTY ACQUIRED UNDER AN ILLEGAL CONTRACT.—Even if the contract of October 1, 1866, is held void, the property accumulated or constructed under it must, as between the parties, be disposed of according to equity, and the court will not refuse to deal with that property on the ground that it was acquired under an illegal contract; following *Planters' Bank* v. *Union Bank*, 16 Wall. 483, and *Brooks* v. *Martin*, 2 Wall. 70.

4. SAME—RIGHTS SO ACQUIRED WILL BE PROTECTED.—It is, therefore, *held*, independently of the question of the validity of the said contract, that the plaintiff has, according to the allegations of the amended bill, an interest in the property in dispute, which a court of equity will protect, and defendants have not the right to seize it by force and without process.

5. SPECIFIC PERFORMANCE — INJUNCTION. — That although a court of equity will not decree the specific performance of a contract requiring continuous duties, involving the exercise of personal labor and cultivated judgment, yet the violation of such a contract may be enjoined.

6. PAROL AGREEMENT TO MODIFY WRITTEN CONTRACT.—The question of the validity and effect of the parol agreement, set out in the amended bill, to annul and abrogate the vicious clause in the written contract of October 1, 1866, is reserved for further argument and future determination.

In Equity.  Demurrer to Amended Bill.

*C. Beckwith, Williams & Thompson* and *Geo. R. Peck*, for complainants.

*I. P. Usher, A. C. Williams* and *Everest & Waggener*, for respondents.

McCRARY, C. J. The demurrer to the original bill having been sustained on the ground of the immorality of a material part of the contract,* set out and made the sole basis of the relief sought, the plaintiff filed an amended bill, which is now before me for consideration; counsel having agreed that the motion to dissolve the injunction shall be regarded as a general demurrer to the amended bill. The part of the contract held vicious is the clause providing for the transmission free of charge of private, social, and family messages of the executive officers of the railway company.

The amended bill makes certain averments, intended to show the right of plaintiff to recover, notwithstanding the insertion of this vicious clause in the original contract.

The question to be determined is the sufficiency of these averments, or of any of them, to entitle plaintiff to the relief sought.

1. The plaintiff now claims that it is rightfully in possession of the right of way, and of the telegraph line in question, by virtue of the provisions of the act of congress of July 2, 1864, entitled "An act for increased facilities of telegraph communication between the Atlantic and Pacific states, and the territory of Idaho." I had occasion to comment upon this act in my opinion upon the demurrer to the original bill, and the conclusion reached was that the act was intended to authorize the United States Telegraph Company, either with or without the consent of the railway company, to construct and operate a line of telegraph along and upon the right of way of the railway company. Whether this right was assigned and transferred to the present plaintiff by a valid contract, was not considered, and that question is now to be determined. The allegations of the amended bill, being admitted, sufficiently show that the United States Telegraph Company had, by virtue of the laws of New York, by which it was created, a right to make an assignment and transfer of all its franchises and property to another telegraph company.

Counsel for respondents insist, however, that this right was

*See *ante*, 1.

not recognized by the above-mentioned act of congress, of July 2, 1864, and that by that act the United States Telegraph Company, and that company only, was authorized to construct its telegraph along the line of the railway. It is said that this was a personal privilege granted to that company, and that, therefore, it could not assign it. Ordinarily, when property, or rights of any kind, are acquired by a corporation, they are to be enjoyed or disposed of in any manner not inconsistent with the law of its being. Unless, therefore, there is something in the act of congress to indicate a different purpose, it must be presumed that the right to remove its line to the railway, and to operate it there, was given to the United States Telegraph Company, to be enjoyed or disposed of under its charter as its other property and rights. By reference to the act of congress it will be seen that nothing is said about the assignment of the rights conferred upon the United States Telegraph Company. The transfer of those rights is neither authorized nor prohibited in terms. We must, therefore, consider the spirit and the purpose of the act to ascertain whether it was the intent of congress to confine the privilege to that company, and to prohibit its transfer. There is nothing to indicate any intent to require the construction of the telegraph line by the United States Company. The evident purpose of the act was to save that company from pecuniary loss by reason of the construction of a rival line by the railway company. It was intended to confer a favor upon the telegraph company by placing it in a position to protect itself from the ruinous competition likely to be established by the construction of another line of telegraph under the Pacific Railway acts. This purpose was more effectually accomplished by leaving its charter right to assign its franchises and transfer its property unrepealed. I am, therefore, of the opinion that the United States Telegraph Company was authorized to assign the rights conferred upon it by the act of July 2, 1864.

I am also of the opinion that the amended bill, taken as true, shows a transfer of those rights to the plaintiff. It follows from this that the plaintiff has rights in respect to the

lines in controversy which a court of equity should protect, independently of the contract of October 1, 1866. It was not a trespasser upon the right of way of the railway company. Without a contract it had a right to go there and construct its lines; and, having expended its means with the consent of the railway company in constructing the existing line, the defendants must not take possession of it by force, and without making compensation. It is not material to determine whether the right of way along the railway, and over its right of way, was also granted by the act of July 24, 1866, for if so no additional rights were conferred. As to a part of the line, the right of the plaintiff outside of the contract is, according to the allegations of the amended bill, very clear. It is averred that prior to 1865 the United States Telegraph Company, with the assent of the railway company, entered upon the right of way of the last-named company west of Lawrence, as it had a right to do under the act of Congress of July 2, 1864, and that in the year 1865, under said right to enter upon said right of way, and construct and operate such line of telegraph, it had constructed a line of telegraph from Lawrence to Fort Riley, a distance of 97 miles, and had also entered into a contract for the construction and delivery to it of a line of telegraph from Leavenworth to Lawrence, and for the residue of the line between Fort Riley and Denver; such lines to be constructed and ready for operation as fast as said railroad should be constructed. It is further averred that said United States Telegraph Company proceeded in the construction of said line of telegraph, until 1866, without objection on the part of the railway company, and was, in 1866, in possession of a line of telegraph from Lawrence to Fort Riley, and was engaged in operating the same, and was engaged in constructing the residue of its line between the mouth of the Kansas river and Denver, and between Lawrence and Leavenworth, and had collected a considerable amount of material therefor. The rights and property here described existed in the United States Company, and were assigned to the plaintiff prior to the execution of the contract of October 1, 1866, and they were, in my view, vested in the

plaintiff prior to, and independently of, the contract. Should the contract be held void, an accounting between the parties would, nevertheless, be necessary, in order to determine their rights with respect to the line of which the property here mentioned and described constitutes an important part.

2. There is another ground upon which I should feel constrained to hold that the plaintiff has, by the amended bill, shown an interest in the telegraph lines and property in controversy which a court of equity should protect. Even if we assume that the contract is void, the property accumulated or constructed under it must, as between the parties, be disposed of according to equity, and the court will not refuse to deal with that property on the ground that it was acquired under an illegal contract. Such is the doctrine established by the supreme court of the United States. The case of *Planters' Bank* v. *Union Bank,* 16 Wall. 483, was a suit to recover money received for the sale of confederate bonds. In the course of the opinion Mr. Justice Strong said: "It may be that no action would lie against a purchaser of the bonds, or against the defendants, on any engagement made by them to sell. Such a contract would have been illegal. But when the illegal transaction has been consummated; when no court has been called upon to give aid to it; when the proceeds of the sale have been actually received, and received in that which the law recognizes as having had value; and when they have been carried to the credit of the plaintiffs, the case is different. The court is there not asked to enforce an illegal contract. The plaintiffs do not require the aid of any illegal transaction to establish their case. It is enough that the defendants have in hand a thing of value that belongs to them. Some of the authorities show that, though an illegal contract will not be executed, yet, when it has been executed by the parties themselves, and the illegal object of it has been accomplished, the money or thing which was the price of it may be a legal consideration between the parties for a promise, express or implied, and the court will not unravel the transactions to discover its origin." *Id.* 499–500.

And see the following cases cited and approved by Justice Strong in his opinion: *Faikney* v. *Reynolds*, 4 Burrows, 66, (2069;) *Petrie* v. *Hannay*, 3 Term, 418, 419; *Lestapies* v. *Ingraham*, 5 Barr, 71; *Armstrong* v. *Toler*, 11 Wheat. 258; *McBlair* v. *Gibbes*, 17 How. 232, 236; *Brooks* v. *Martin*, 2 Wall. 70.

In *Brooks* v. *Martin* it was held, upon full consideration, that after a partnership transaction, confessedly in violation of an act of congress, has been carried out, a partner in whose hands the profits are cannot refuse to account for and divide them on the ground of the illegal character of the original contract. All of these cases admit the invalidity of a contract bottomed in immorality or in a violation of a statute, and they all agree that where a party comes into court and asks relief upon such a contract it must be denied. But they make a distinction between those cases in which a court is asked to enforce such a contract, and those in which a court is asked to deal with property which has been acquired as the result of the execution thereof. Such property may constitute the subject-matter of a suit at law or in equity, notwithstanding the invalidity of the contract under which it was acquired. Applying this doctrine to the case in hand, we find, according to the allegations of the amended bill, that besides the property acquired by plaintiff from the United States Telegraph Company (and which became and is a part of the line) the plaintiff has expended upon said line over one hundred thousand dollars in excess of the contributions made by the railway company under the contract.

The fact seems to be that, by expenditures made by the plaintiff, and by contributions from the railway company, the line has been constructed, reconstructed, and maintained. If the contract were set aside it would, I think, leave the parties joint owners of the property, and a case for equity jurisdiction, in the adjustment and settlement of their respective interests, would be presented.

3. I reserve for further consideration hereafter the question of the effect of the parol agreement set out in the amended

bill, by which the parties, as is alleged, contracted with each other to abrogate, annul, set aside, and expunge from said contract the clause providing for the transmission of private, social, and family messages of the executive officers of the railway company free of charge. Whether said agreement was made upon sufficient consideration; whether, if valid, it left the entire contract in parol; and whether, if so, the unexecuted portion is void under the statute of frauds, — are all important questions, which may become very material in the further progress of the cause. In the view I have taken of other questions it is not necessary now to decide these, and I leave them open for further argument and further determination.

4. It is insisted by counsel for defendants that the contract set out in the bill (assuming its validity) is one which requires the performance of continuous duties, involving the exercise of skill, personal labor, and cultivated judgment; and that, therefore, a court of equity will neither decree its specific performance nor enjoin its violation. That the contract is in its nature incapable of being enforced by a decree for specific performance is very clear, (*Marble Co.* v. *Ripley*, 10 Wall. 339;) but it does not follow that a party to such a contract can have no injunction to restrain its breach. It is now settled, I think, by the decided weight of authority, that in such cases, although the affirmative specific performance of the contract is beyond the power of the court, its performance will be negatively enforced by enjoining its breach. Pomeroy on Specific Performance, §§ 24, 25, 310, 311, and 312, and cases cited. If, therefore, the contract shall be finally held valid by reason of the elimination of the vicious clause, or on any other ground, it will follow that the injunction was properly granted. If it should be held that the contract is void, it will still, in my judgment, follow that the defendant should be restrained from taking possession of the property accumulated, under the circumstances stated in the amended bill, until an accounting and settlement can be had.

The demurrer to the amended bill is overruled. Defendants may answer if they see fit. If they stand upon their

demurrer, there will be a decree continuing the injunction in force until final decree settling the respective rights of the parties can be had. *State of Georgia* v. *Bruelesford,* 2 Dall. 406, 408.