PULLMAN PALACE-CAR CO. v. CENTRAL TRANSP. CO.

CENTRAL TRANSP. CO. v. PULLMAN PALACE-CAR CO.

(Circuit Court, E. D. Pennsylvania.   December 19, 1894.)

No. 44.

1. UNLAWFUL CONTRACT—RESTITUTION.
    When property has been transferred under an unlawful contract, a court of equity will compel the restitution thereof by one who repudiates the contract, except when such contract involves moral turpitude.

2. SAME—ULTRA VIRES.
    The C. Co. and the P. Co., in 1870, were both engaged in the business of building and operating sleeping cars. In that year it was agreed between them that the property and business of the C. Co., including a large number of cars and their equipment, valuable patent rights, and contracts with railroad companies, should be leased to the P. Co. An act was secured from the legislature of Pennsylvania, in which state the C. Co. was organized, which was supposed to authorize the lease, which was accordingly executed, and the P. Co. took possession, and continued to operate and use the property of the C. Co. until 1885. In the meantime, cars and equipment of the P. Co. took the place of those of the C. Co., and the property and business of the latter were completely merged in the former, as was intended by the parties. In 1885, the P. Co. repudiated the lease, and resisted the payment of rent, when sued for by the C. Co., on the ground that the lease was in excess of the lessor's authority, and against public policy. This contention was finally sustained by the courts. The C. Co. then sought, in equity, to obtain restoration of or compensation for the property transferred under the lease, which the P. Co. refused, upon the ground that it was not responsible for the property, because transferred under an unlawful contract. Held, that the contract between the companies, having been made in reliance upon a statute believed by both parties to confer authority to make it, and without any intention to injure the public, involved no moral turpitude, and the P. Co., which had received the property of the C. Co. without right, must account for the same to the C. Co.

3. SAME—MEASURE OF COMPENSATION.
    Held, further, that the measure of compensation upon such accounting should be the value of the property of the C. Co. at the time of the transfer, together with its earnings thereafter, less the amount of rent received.

This was a suit by Pullman Palace-Car Company against the Central Transportation Company, and a cross bill by the latter company against the former. The cause was heard on pleadings and proofs.

John G. Johnson and Frank P. Prichard, for complainant.

A. H. Wintersteen, Geo. Tucker Bispham, Edward S. Isham, and John S. Runnells, for defendant.

BUTLER, District Judge. The Central Transportation Company, a Pennsylvania corporation, chartered December 30, 1862, with a capital of $200,000, authorized to construct sleeping cars and run them under contract with such railroad companies as might contract with it, entered upon the exercise of its franchises, built cars, and operated them in pursuance of such contracts. At this time the sleeping-car business was in its infancy; but soon a great demand arose for such cars, and with the improvements made from

time to time for the accommodation and comfort of travelers using them, it quickly became profitable. The business of this company so increased that in 1865 an enlargement of its capital became necessary, and under authority of the laws of the state it was made $2,000,000. From that time forward its earnings and net profits appear to have been large. By 1870 it had become the owner of 119 cars with their equipments, at a cost, including repairs, of over a million and a half of dollars, was the licensee of various patents for such cars, and the owner of others, on account of which it had paid (probably) half a million of dollars; it had also acquired valuable contracts with many railroad companies, whose roads mainly traversed the country between the Mississippi river and the Atlantic Ocean, forming an important and valuable system on which to prosecute its business of operating sleeping cars.

The Pullman Company was incorporated in 1867, having similar franchises, and was engaged in the same business, with an original capital of $1,250,000, which was increased, two years later to $1,750,000. It also had prospered, and in 1870 was the owner of many cars, which it operated under contracts with various railroad companies, mainly in the western sections of the country.

At this time controversy arose and litigation commenced between the parties; and in view of the situation they mutually agreed that a union and consolidation of the two systems and their business was desirable. In consequence, on February 17, 1870, a lease of the property and business of the Central Transportation Company to the Pullman Company was agreed upon and executed, the rent being fixed at $264,000 per annum subject to specified contingencies.

Shortly before entering into the lease the Central Transportation Company purchased the patents under which it had previously paid royalties as licensee, for the sum of $266,000 thereby adding this much to the cost value of the property transferred.

Question having arisen respecting the authority of the Central Transportation Company to make the proposed lease, application was made to the legislature of Pennsylvania, at the instance of both parties, on this account, and the following statute, dated February 9, 1870, was passed:

"Be it enacted * * * that the charter of the Central Transportation Company * * * be and the same is hereby extended for ninety-nine years from the expiration of its present charter; and said company is hereby empowered to enter into contracts with corporations of this state or any other for the leasing or hiring and transfer to them of their railway cars and other personal property; and shall have power to increase their present capital stock $200,000."

Exhibit A, attached to the original bill, is a copy of the lease, to which we need not at present make further reference.

The Pullman Company took possession of the property and business transferred, consolidating it with its own, thereby creating one harmonious system of sleeping-car transportation, that extended throughout the country. Some of the cars received were subsequently sold, as unsuited to existing requirements of the lessee's business and others were abandoned as worn out. Some of the railroad contracts were replaced by new ones taken in the name of the

Pullman Company, and some were canceled. The evidence seems to warrant the defendant's statement that "of the one hundred and nineteen cars transferred, five have disappeared, without compensation to the Pullman Company, seventy-seven have been sold, that thirty-seven are on hand; and that a total of seven hundred and thirteen thousand three hundred and thirty-four dollars has been received by the Pullman Company," on account of the sales. The car equipments have disappeared. Whether this statement is entirely accurate is not important at this time. Pullman cars and equipments have taken the place of the cars and equipments of the Central Transportation Company, and the property and business of the latter company are completely merged in the property and business of the former—as the parties no doubt contemplated they should be, when executing the lease. The consolidation intended, of the interests and prospects of the two companies, could not otherwise be accomplished. The effect of uniting the business in the Pullman Company appears to have fully justified the expectation of the parties. The increase of profits over the separate earnings of the two companies was immediate, continuous, and very large.

The Pullman Company paid the stipulated rent as it matured, until January, 1885, when a dispute arose between the parties, (the nature of which is unimportant here), and further payments were refused. The Central Transportation Company sued for the next installment, and recovered a judgment, which was reversed. A second suit being commenced for the following installment the defendant repudiated the lease, by pleas denying its validity, as in excess of the lessor's authority and against public policy. This defense was sustained in the court below, and also in the supreme court. While the case was pending the Pullman Company filed the original bill, now before us, praying an injunction against further prosecution of the suit, and against bringing other suits for subsequent installments; setting up as grounds for equitable interference (in substance): First, that the net earnings of the business had fallen below $264,000, and that the company therefore, desired to surrender the lease in pursuance of its terms, that it was impossible to restore the cars and equipments, or reassign the contracts, and that therefore the aid of a court of equity was necessary to ascertain what compensation should be made; and second, that the lease is invalid because the lessor had no authority to make it, and consequently that the Pullman Company was under no obligation except to return such part of the property as could be returned, and render compensation for what could not; that it desired to do this and needed the court's aid in the premises.

After hearing the parties the court declined to interfere with the suit pending, on the ground that the validity of the contract could be there tried as well as in equity, but enjoined against bringing other suits for subsequent installments.

After the decision referred to had been rendered the plaintiff moved for leave to discontinue the bill, and the defendant for leave to file a cross bill to enforce return of the property or compel compensation. The first of these motions was dismissed, and the second allowed.

Many facts which may be important in a subsequent stage of the case are omitted here as unimportant.

The Pullman Company's answer to the cross bill, denying responsibility for the property received, raises the principal question before us. The denial rests on the fact that the property was transferred under an unlawful contract.

The following propositions respecting such contracts, may be affirmed with confidence: First, that the courts will not enforce them; second, that the courts will not interfere for the relief of either party when they have been executed; third, that the courts will interfere to compel restitution of property received under such a contract by one who repudiates it,—except when the contract involves moral turpitude. These propositions find ample support from text writers and the courts. The third only is involved here; and omitting what is embraced by the exception, it is indisputable. What constitutes "moral turpitude," or what will be held such, is not entirely clear. A contract to promote crime certainly involves it. A contract to promote public wrong, short of crime, may or may not involve it. If parties intend such wrong, as where they conspire against the public interests, by agreeing to violate the law or some rule of public policy, the act doubtless involves moral turpitude. When no wrong is contemplated, but is unintentionally committed, through error of judgment, it is otherwise. Turpitude is defined by Webster to be "inherent baseness or vileness of principle, or acting, shameful wickedness." No unintentional wrong, or improper act innocent in purpose, can involve it. When individuals or corporations enter into contract in excess of authority or violate some rule of law unintentionally, the act does not involve moral wrong, much less turpitude. The subject has been much before the courts, and while loose and misleading expressions appear occasionally, the decisions are all reconcilable with this statement. The numerous cases cited by the plaintiff present no exception. Bank v. Owens, 2 Pet. 538, decides, only, that the courts will not enforce an unlawful contract. Wheeler v. Sage, 1 Wall. 518, is altogether inapplicable. Coppell v. Hall, 7 Wall. 542, was a suit, substantially, for the fruits of an unlawful contract. St. Louis, etc., R. Co. v. Terre Haute & I. R. Co., 145 U. S. 393 [12 Sup. Ct. 953], decides that the court will not set aside an unlawful contract which has been so far executed as to make this inequitable. Higgins v. McCrea, 116 U. S. 671 [6 Sup. Ct. 557], decides that the defendant's counterclaim, for money expended in promoting an "offense against the law," cannot be recovered. In King v. Green, 6 Allen, 139, the contract was fully executed, and the court therefore refused to interfere. Atwood v. Fisk, 101 Mass. 363, was a bill to recover property parted with under an unlawful contract, while the plaintiff held the consideration. In Johnson v. Hulings, 103 Pa. St. 498, the plaintiff's cause of action rested on an unlawful consideration—compensation for selling property in violation of the license laws. Myers v. Meinrath, 101 Mass. 366, is identical with King v. Green, 6 Allen, 139, being a suit to recover back property parted with under an executed contract. Thomas v. City of Richmond, 12 Wall. 349,

was a suit to enforce an illegal contract, and Brown v. Tarkington, 3 Wall. 377, is the same in principle. Dent v. Ferguson, 132 U. S. 50 [10 Sup. Ct. 13], decides that "where one transfers property to defraud creditors, and for years acquiesces; concurring in devices, collusive suits and impositions on courts, to further the purpose," equity will not aid him to recover it back. Clements v. Yturria, 81 N. Y. 290; Holt v. Green, 73 Pa. St. 200; Thomson v. Thomson, 7 Ves. 473; Sykes v. Beadon, 11 Ch. Div. 193; Snell v. Dwight, 120 Mass. 15,—were all suits to enforce illegal contracts.

It is thus seen that not one of these cases is inconsistent with the proposition stated.

On the other hand, Morawetz on Corporations at section 721, says:

"The general rule is that if an agreement is legally void and unenforceable by reason of some statutory or common-law prohibition, either party to the agreement who has received anything from the other party, and has failed to perform the agreement on his part, must account to the latter for what has been so received. Under these circumstances, the courts will grant relief irrespective of the invalid agreement, unless it involves some positive immorality, or there are other reasons of public policy why the courts should refuse to grant any relief in the case."

In a footnote he says:

"It is sometimes said to be a maxim 'in pari delicto melior est conditio possidentis.' The word 'delicto' in this instance, however, means something more than mere illegality. It is difficult to define what constitutes such immorality as will cause the courts not only to declare a contract legally void, but to refuse all relief to the parties, irrespective of the contract. The decisions indicate that the matter rests largely in the discretion of the court in each particular case.

"Persons who, at the expense of a corporation, have received benefit from an ultra vires transaction, even a transaction that is illegal as against public policy, may have to refund to the corporation to the extent of the benefit they have received."

Taylor on the Law of Private Corporations (section 314) says:

"The general rule in regard to contracts which are not immoral, or where there are no other reasons of public policy why courts should refuse to grant relief, but are simply illegal and unenforceable on account of some statutory or common-law prohibition, is that either party to them who has received anything from the other party, and has failed to perform the agreement on his part, must account to the other for what has been so received. * * * These principles have been repeatedly applied in actions growing out of contracts entered into by corporations. Though illegal and unenforceable as contracts, recovery of the consideration has generally been allowed where higher public consideration than the immediate equities between the parties, were not involved."

Spelling on Private Corporations (section 167) says:

"Why should not a corporation be always liable to refund the money or property of a person which it has obtained improperly and without consideration, or if unable to return it, to pay for the benefit obtained thereby? To say that a corporation cannot sue or be sued upon an ultra vires arrangement is one thing. To say that it may retain the proceeds thereof, which have come into its possession, without making any compensation whatever to the person from whom it has obtained them, is something very different, and savors very much of an inducement to fraud. On the other hand, a person who has obtained corporate property or funds in an ultra vires transaction, has obtained what the parties dealing with him had no power, no authority, to alienate. It belongs to the corporation, not to him. Therefore, as in every case of a person obtaining, however bona fide, that which belongs to another, such person must make restoration, in specie or in value, it seems

necessarily to follow that restoration must similarly be made when the alienation is ultra vires."

Waterman on Corporations (section 161, p. 608) says:

"Though a corporation cannot be sued, any more than any other citizen, directly upon a contract or analogous transaction which does not bind it, yet if it sets up this defense, it must restore to the other party what it has obtained from him. It may repudiate the transaction if it chooses, but if so, it must repudiate altogether; it cannot reprobate and approbate; it cannot keep what in another form it has rejected."

The case of Spring Co. v. Knowlton, 103 U. S. 49, is worthy of particular notice. The suit was for property parted with under an unlawful executory contract. The court, after remarking on the absence of moral turpitude, says:

"The question is whether, conceding the contract to be unlawful, the property parted with under it can be recovered back from the other, who has not performed."

The court holds that it may, and attributes importance to the plaintiff's ignorance of the unlawfulness.

Parkersburg v. Brown, 106 U. S. 487 [1 Sup. Ct. 442], is to the same effect. Here again the court points to the fact that the illegal transaction is free from moral turpitude, and says:

"But notwithstanding the invalidity of the bonds and of the trust, the O'Briens had a right to reclaim the property and to call on the city to account for it. The enforcement of such right is not in affirmance of the illegal contract, but is in disaffirmance of it, and seeks to prevent the city from retaining the benefit which it has derived from the unlawful act. * * * To deny a remedy to reclaim it is to give effect to the illegal contract. The illegality of the contract does not arise from any moral turpitude. * * * In such a case the party receiving may be made to refund to the person from whom he has received property for the unauthorized purpose, the value of that which it has actually received. See White v. Bank, 22 Pick. 181; Morville v. Society, 123 Mass. 129; Davis v. Railroad, 131 Mass. 258, 275; and cases there cited. The O'Briens having indorsed and sold the bonds, the holders succeeded to such right of the O'Briens, as an incident to the ownership of the bonds. The O'Briens suffered the city to take possession of and administer the property. They were made parties to this suit originally, and have made no defense to it. The right which the plaintiffs so have to call on the city to render an account of the property is one which can be properly adjudicated in this suit in equity."

In Central Transp. Co. v. Pullman Palace-Car Co., 139 U. S. 24 [11 Sup. Ct. 478] (where the contract now under consideration is involved), the court said:

"A contract ultra vires being unlawful and void, not because it is in itself immoral, but because the corporation, by the law of its creation, is incapable of making it, the courts, while refusing to maintain any action upon the unlawful contract, have always striven to do justice between the parties, so far as could be done consistently with adherence to law, by permitting property or money, parted with on the faith of the unlawful contract, to be recovered back, or compensation to be made for it.

"In such case, the action is not maintained on the unlawful contract, nor according to its terms, but on an implied contract of the defendant to return or, failing to do that, to make compensation for property or money which it has no right to retain. To maintain such an action is not to affirm, but to disaffirm, the unlawful contract."

In Bank v. Townsend, 139 U. S. 67 [11 Sup. Ct. 496], the bank was required to refund property received under an unlawful executory contract, the court saying:

"The bank admitting that it obtained the property in violation of law is bound to return it. The obligation to do justice, as we said in March v. Fulton, 10 Wall. 676, rests upon all persons, natural and artificial, and if one obtains the property of another without consideration or authority of law he will be compelled to make restitution. * * * This is a very different thing from enforcing an illegal contract."

Atlantic & P. Tel. Co. v. Union Pac. Ry. Co., 1 McCrary, 188 [1 Fed. 745]; Farmers' Loan & T. Co. v. St. Joseph & D. C. R. Co., 1 McCrary, 247 [2 Fed. 117]; W. U. Tel. Co. v. Union Pac. Ry. Co., 1 McCrary, 558 [3 Fed. 423]; Railroad Co. v. Simpson, 23 Fed. 214; and Manchester & L. R. Co. v. Concord R. Co. (N. H.) 20 Atl. 383,—are to the same effect.

It seems to be true that the distinction between "malum prohibitum" and "malum in se" (which never had the support of just reason) has disappeared. This however is unimportant. The distinction had no legitimate bearing on the question.

Thus it follows that unless the execution of the contract between the Central Transportation Company and the Pullman Palace-Car Company involves moral turpitude as before described, the former may recover back the property parted with under it. That it does not involve such turpitude seems clear. Neither party contemplated any wrong. Both believed the contract to be lawful. The statute of 1870 was supposed to confer full authority to make it. The state had unquestionable power to grant the authority; and the evidence shows that the statute was procured for the express purpose of granting it. The question whether the statute did or did not grant it was a close and difficult one. The learned counsel of the parties and the court disagreed on the subject. It is a question of interpretation. In the court's view the lease was ultra vires and void; in the counsel's it was authorized and lawful. True it violated a rule of public policy, but this was only because the court construed the statute more narrowly than the legal advisers of the parties had done. The legislature is the judge of what the public interests require in the premises, and if it had authorized the lease, as the parties honestly believed it had, no question of public policy could have arisen. All that can justly be said, therefore, is that the parties misconstrued their authority, and that the lease is consequently ultra vires. Whether the lease actually tended to the public disadvantage may be doubted, in view of the evidence. Certainly, the Pullman Palace-Car Company cannot assert that it did, against its own unqualified declaration to the contrary,—found in the lease. It would seem difficult to state a case more distinctly and completely within the principle invoked than the one before us. The right to restitution is indeed distinctly admitted by the original bill in this case.

The property must therefore be returned or paid for. The former is impossible. The property has substantially disappeared. It has become incorporated with the business and property of the plaintiff, and cannot be separated. Compensation must therefore be made. What then is the measure of compensation? Clearly, we think, the value of the property when received, together with its earnings since, less the amount paid as rent. In ascertaining the value the annual rental may be considered; but it does not afford a conclusive, nor

entirely safe measure of value, because the unlawful consideration (that the Central Company would abstain from exercising its franchises) entered into it. For the same reason the earnings cannot be measured by the rent. The value of the property and earnings must be ascertained from a careful examination of the property and the business at the time they passed into plaintiff's hands, and subsequently. It is not their value to the plaintiff we want, but to the defendant. In effect what it lost by parting with them. The value of both property and earnings may have been worth more to the plaintiff with the business united. But this cannot be considered.

For the purpose of ascertaining these values the court refers the subject to Theodore M. Etting, Esq., as master, with direction to report within 60 days (from the testimony taken and such further as may be produced), unless the time shall be extended by agreement of counsel, or on application to the court.

The question of jurisdiction need not be discussed. The character of the relief required and the nature of the inquiry necessary to afford it, puts this beyond controversy. Besides the point is conceded by the bill originally filed.

The propriety of allowing the defendant to file a cross bill may, rest upon what was said when the allowance was granted.

DALLAS, Circuit Judge, concurs.