[No. 29245. Department Two. November 17, 1945]

J. E. MELTON, *Appellant,* v. UNITED RETAIL MERCHANTS OF SPOKANE, WASHINGTON, *Respondent.*[1]

[1]Reported in 163 P. (2d) 619.

*Thomas Corkery* and *H. Earl Davis*, for appellant.

*Tustin & Chandler* and *Clyde H. Belknap*, for respondent.

ROBINSON, J.—This is a contract action in which a jury returned a verdict for the defendant, and plaintiff, appealing from the resulting judgment, prays for a new trial. It is a most involved and extraordinary case. Each of the parties to the appeal contends, and plausibly argues, that the story of their business relationship, as told by the other, is so fantastic as to be beyond belief; and we may say, in this connection, that an examination of the record, which contains a transcript of testimony nearly a thousand pages in length, and documentary exhibits sufficient to fill a small suitcase, leaves us with an uncomfortable feeling that it does not reveal the truth, the whole truth, and nothing but the truth. However, in examining the record, it is not our burden, or within our province, to determine what is true and what is not. We have concluded that a new trial must be granted. The procedural errors claimed are of such a nature as not likely to recur, and this opinion will be confined to certain of the assignments relating to instructions. In our opinion, at least two of such assignments are clearly well taken.

The action was brought on a written contract, or, as re-

spondent would have it, on a "purported" written contract. We quote the alleged contract in full and suggest that it be kept in mind, while reading the instrument, that, at the close of the trial, the jury was instructed that it might find it illegal and void, and unenforcible as being against public policy:

"This agreement is made this 22nd day of September, 1941, between J. E. Melton and the United Retail Merchants of Spokane, Washington, also known as the U.R.M. Stores, a corporation:

"I. The said United Retail Merchants of Spokane, Washington, a corporation, has since approximately the year 1933 purchased trucks and equipment from J. E. Melton as follows: [Here follows detailed description of seven trucks, with a valuation in dollars after each description.]

"The above amounts total Twenty-two Thousand, One Hundred Twenty-nine and 74/100ths Dollars ($22,129.74).

"II. Said Melton agrees to serve said company as truck manager and see that the trucks are kept moving and that said U.R.M. Stores, Inc. merchandise is delivered to and from their warehouse as the company desires.

"III. It is further stipulated that the U.R.M. Stores, Inc. shall pay J. E. Melton the union scale wage once a week and said company is to pay all expenses on said trucks and equipment from this date on.

"IV. It is agreed that the said company may discharge said Melton in said employment at any time it desires, and that said total sum of Twenty-two Thousand, One Hundred Twenty-nine and 74/100ths Dollars ($22,129.74) for the purchase of said trucks and equipment by said company from said Melton as per the above itemized list, shall become due and payable by said company to said Melton at the time of his discharge.

"V. It is agreed that the said company is to pay said Melton on September 22, 1946, the sum of Fifteen Thousand Dollars ($15,000.00) which sum is to be in addition to those amounts that have been advanced by said company weekly to said Melton per 100 lbs. of freight and said sum of Fifteen Thousand Dollars ($15,000.00) is for the work and skill of said Melton in building up the three runs of the said company known as Bonners Ferry and Sandpoint run, Wallace and Mullan run, and the Lewiston and Winchester run.

"VI. This agreement as to the employment of said Melton by said company is for five (5) years from September 22,

1941, unless sooner terminated by Melton's discharge as herein provided.

"VII. It is agreed that if said Melton is discharged before September 22, 1946, then the above sums of Fifteen Thousand Dollars and Twenty-two Thousand, One Hundred Twenty-nine and 74/100ths Dollars shall become due at the date of said Melton's discharge and said sums totaling Thirty-seven Thousand, One Hundred Twenty-nine and 74/100ths Dollars ($37,129.74), shall bear interest at Three (3%) per cent per annum from September 22, 1941, until paid and said sum of Thirty-seven Thousand, One Hundred Twenty-nine and 74/100ths Dollars ($37,129.74) is in addition to the union wages which is to be paid Melton from this date on and in addition to the costs of operation of said truck and equipment from this date on.

"VIII. I have the legal authority to make or dispose of any and all agreements for the U.R.M. Stores, Incorporated, and have read the foregoing document, which I believe to be just and for the proper amount therefor.

"E. H. Roeders [Signature in longhand]
"Asst. Mgr. of U.R.M. Stores, Inc.
"J. E. Melton [Signature in longhand]

"Subscribed and sworn to before me this 22nd day of September, 1941.

"F. F. Vawter [Signature in longhand]
"Notary Public, State of Washington
[Notarial Seal]         residing at Spokane, Washington"

It should be borne in mind throughout, that the foregoing contract, referred to in the pleadings as exhibit A and in the instructions as exhibit No. 1, was the contract upon which the appellant sued, and that at no time did he seek a recovery upon any other.

The original complaint was served on October 2, 1942. The case was, however, tried on an amended complaint served on defendant's attorneys in December, 1942. The complaint is of considerable length. Since the contract speaks for itself, it will be sufficient for our present purpose to say that plaintiff alleged the making of the contract, and that the defendant had made its performance impossible and had discharged him.

By way of answer, the defendant categorically denied

substantially all of plaintiff's allegations. Of its denials the following raised the major issue in the case:

"VII. As to paragraph VII thereof, denies each and every allegation therein contained, and particularly denies that plaintiff's Exhibit A [the contract above quoted] was executed by this defendant or by any person in any way authorized by it."

We speak of this denial as raising the major issue, because first, if it be established, it, in and of itself, defeats the action; and second, defendant's plea of nonexecution left no room for certain defenses which, under the peculiar circumstances of this case, might reasonably have been expected, such as that assent to the contract (as distinguished from physical execution) was procured by threats or duress or by active fraud or misrepresentation. Manifestly, such defenses would be wholly inconsistent with the plea of nonexecution.

Illegality was not pleaded. We will now attempt to show how it crept into the record.

The defendant pleaded four affirmative defenses. On appeal, we are concerned with but two of these. The first read as follows:

"I. Defendant was organized as a buying agency of a number of retail grocery stores situated in Eastern Washington and Northern Idaho, to enable said constituent members to obtain the benefits of lower prices through larger purchases, which savings, reflected in lower selling prices for their goods, would enable them to meet the competition of competitors similarly operated. Ever since its organization it has been operated for said purposes. The matter of the freight cost of goods was at all times of great importance to such member stores as affecting the price at which they could offer such goods to the consuming public.

"II. In or about the year 1936 plaintiff solicited the defendant for the hauling of defendant's goods and to secure defendant's aid in procuring hauling agreements from the owners of member stores over certain established routes. At that time, and at all times since, the Commission on Highway Transportation of the State of Washington and the Interstate Commerce Commission had established definite freight rates for the transportation of goods by motor car-

riage between the various points from and to which goods handled by defendant were to be hauled under the arrangement so solicited by plaintiff. Plaintiff represented to defendant that he was a competent operator of motor freight and owned a fleet of trucks. Some of the trucks described in the Amended Complaint were trucks then owned by him and others in said described list were substitutes for or additions to the trucks then represented to be owned by him. As an inducement to obtain hauling, plaintiff proposed to do such hauling with his own men and equipment and entirely at his own expense, at a rate lower than said established rates for such hauling. He explained that in order to accomplish such result, it would be necessary to have the record title of his trucks placed in the name of defendant, but without affecting the ownership thereof, and to keep books and records to make it appear that defendant was doing its own hauling with its own equipment and that plaintiff was working for defendant on a salary. In order to obtain such reduction in freight rates and thereby enable member stores of defendant to sell merchandise at lower prices to the consuming public, defendant accepted such proposal. All of the negotiations and statements made in connection with said transaction were oral. Thereafter the parties acted under such oral arrangement until about the time of the commencement of this action. The record title of plaintiff's trucks was transferred to defendant, the purchase of any new trucks was made by plaintiff in the name of defendant, records of both parties were kept and statements, both oral and written, made so as to make it appear that defendant was the owner of the trucks, that it was itself paying the cost of maintenance and operation thereof, and that plaintiff was a mere employee. Said matters, records and statements were largely, or entirely, fictitious. Plaintiff or his transferees at all times remained the actual owner or owners of said trucks and paid the entire cost of operation thereof. Defendant held the record title to said trucks in trust for the plaintiff or persons to whom he sold certain of said trucks. Regardless of any books, records or statements kept or made by plaintiff or defendant with reference to said hauling transactions, plaintiff received from defendant and from the store members of defendant, through the instrumentality or agency of defendant, compensation for all hauling done by him solely for the amount of freight hauled by him at the agreed rate therefor, and paid all of the expenses incurred in connection with such hauling and with the trucks

used for that purpose. Defendant never paid or agreed to pay any part of the purchase price of said trucks or the expenses involved in such hauling, or to pay the plaintiff anything whatsoever other than the freight for such hauling at the agreed price."

This pleading does not give notice that the defendant would contend that the contract sued upon was illegal. It was rather in aid of its denial that it had executed that contract. It was urged that evidence that the plaintiff had actually hauled goods for the defendant throughout the whole relationship of the parties, under a wholly different agreement, would strongly tend to prove that no such contract as the contract sued upon was ever executed, or, at the very least, would tend to raise a doubt that it was. On that theory, defendant succeeded in getting the evidence tending to prove this affirmative matter into the record, over the plaintiff's vigorous objection that it was thereby attempting to vary a written contract by parol. That this is so, appears throughout the record. We need not quote from the record itself to demonstrate that this evidence was admitted in support of defendant's contention that the contract sued upon never came into existence. It can be more briefly, and quite as conclusively, shown by quoting from the respondent's brief on appeal.

Appellant's third assignment of error is as follows:

"III. The court erred in permitting the defendant, over repeated objections and exceptions of plaintiff, to give oral evidence varying or attempting to vary the terms of the written contract (Exhibit 1) sued on herein."

In replying to the argument made in support of this assignment, respondent says, in its brief:

"It is the law that parol evidence may not be admitted to vary the terms of a written agreement, but respondent introduced no evidence to *vary* the alleged agreement. Evidence was introduced *to show there never was any such contract.*"

Appellant also assigned error as to instruction No. 10. This instruction, as given, read as follows:

"Where a party plaintiff seeks to recover for breach of a

specific contract and the party defendant against whom such relief is sought denies the making or legal efficacy of said contract, as defendant has done in this case, then it becomes competent for said defendant to show that no contract was in fact made; or to show what the contract really was; or to show facts and circumstances indicating that the specific contract alleged by plaintiff could not have been made; or to prove in general anything tending to show that plaintiff's allegations are untrue.

"Therefore, you are instructed that if you believe from a preponderance of the evidence in this case that the written contract, Plaintiff's Exhibit No. 1, was in fact not made, or could not have been made, or that a different contract existed between the parties, then your verdict must be for the defendant."

After quoting the foregoing instruction in its brief, the respondent defends it as follows:

"Appellant's exception is not well taken. The court in its Instruction No. 10 does not state that respondent might prove both that there was no contract at all and also that there was at the same time a different contract. The Instruction is couched in the alternative. It states that it would be a defense to Exhibit 1 *either* to prove that no such contract at all was made *or,* since the making of Exhibit 1 was denied, to prove that a different contract existed."

That was the purpose for which the evidence complained of was offered and admitted. Its admission, whether lawful or not, resulted in great misunderstanding and confusion; for this evidence was ultimately employed for another and quite different purpose. Having introduced the evidence to support its claim that no such contract as that sued upon ever came into existence, and while still maintaining that position, the defendant asserted the verbal agreement, which it had thus proven, or attempted to prove, was illegal, and not enforcible on the ground of public policy, and the attention of both the court and the jury became focused on that point. To put it baldly and in the vernacular, the alleged verbal agreement was successfully employed as a "straw man." *It was the written contract, exhibit 1, that the plaintiff was attempting to enforce.*

Before we can outline the issues that were submitted to

the jury, it will be necessary to note that a second affirmative defense was pleaded, as follows:

"For a SECOND AFFIRMATIVE DEFENSE, defendant alleges:

"I. E. H. Roeders became assistant manager of defendant on or about the 17th day of June, 1940, and remained in such capacity until on or about the 16th day of February, 1942. *If his name was in fact subscribed by him to plaintiff's Exhibit A, such signature was obtained by plaintiff through fraud, trick or device in form and manner to defendant unknown, and without any intention on his part of executing said instrument as an agreement binding upon the defendant, even had he had authority so to do.*" (Italics ours.)

And so, when the case was ready for the jury, the issues were as follows: The plaintiff was standing upon the written contract upon which the suit was based. The defendant was asserting (1) that it did not execute that contract; (2) that, if the purported signature of its general manager, E. H. Roeders, was genuine, it was procured by some trick or device; and (3) the claim of illegality.

After stating the issues made by the pleadings in instruction No. 1, the stock instructions relating to burden of proof in instruction No. 2, and the law as to contracts made by a corporate agent in instruction No. 3, the court gave the following instruction No. 4:

"Before plaintiff is entitled to recover in this action on the alleged written contract, Plaintiff's Exhibit No. 1, he has the burden of establishing by a preponderance of the evidence;

"1. That said contract was executed by said E. H. Roeders;

"2. That said E. H. Roeders had actual or apparent authority to act for and bind said defendant as its agent with reference to the subject-matter of said contract;

"3. That he was discharged, or that defendant by its acts rendered it impossible for him to further continue as truck manager for defendant.

"*If plaintiff has established the foregoing propositions by a preponderance of the evidence, then your verdict must be for him in the sum of $37,129.74.*" (Italics ours.)

Plaintiff, of course, did not except to this instruction, but, as will be pointed out later in the opinion, the defendant did. Later on, having dealt with other matters in instructions

Nos. 5, 6, 7, 8, 9, and 10, the court, without referring to instruction No. 4 in any way, gave, out of a clear sky, instruction No. 11, to a portion of which the appellant did except. We quote that portion:

"I instruct you that it is the law of the State of Washington, and has been at all times since 1935, that the business of operating as a motor carrier of freight for compensation along the highways of this state is a business affected with a public interest; that no person may haul goods for another under a contract for compensation as a motor contract carrier without obtaining a permit from the Department of Public Service of the State of Washington and filing a copy of his contract with the Department; and when such permit is granted he must abide by the regulations of the Department and charge the rates for hauling as fixed or approved by the Department. This does not apply to a person or corporation hauling his or its own goods in his or its own truck. Substantially similar provisions apply, and at all said times applied to interstate motor carrier hauling under the Interstate Commerce law and the regulations of the Interstate Commerce Commission. If you find from the preponderance of the evidence in this case that the agreement between plaintiff and defendant for the haulage of goods and their acts thereunder were made and done for the purpose of circumventing, avoiding, or defeating the law of this state or of the Federal Government, or either or both, in this regard, then I instruct you that any part of such agreement, and acts thereunder made or done for such purpose were contrary to public policy and void; and that neither party to such illegal transaction can recover from the other anything whatever on account of such illegal transaction, or the illegal portion thereof; but that the law will leave the parties where it finds them. *Therefore, if you find from such preponderance of evidence that any part of plaintiff's claims against defendant grew out of such illegal agreement, your verdict should be for the defendant as to such illegal parts, if any, of plaintiff's claims.*

"If, on the other hand, you find from a preponderance of the evidence that defendant was operating said trucks for itself and that it had employed plaintiff as a truck driver or truck manager for the fulfillment of that purpose, then said laws and regulations of the State of Washington and the Interstate Commerce Commission would not apply to the agreement under which plaintiff was thus employed."

It is readily apparent that instructions Nos. 4 and 11 are in head-on and irreconcilable conflict. In instruction No. 4, the jury was categorically told that, if the plaintiff "has established" (1) that the contract sued upon was executed by Roeders; (2) that he had authority to bind the defendant; and (3) that plaintiff was discharged, or that defendant rendered it impossible for him to perform the contract, "then your verdict must be for him in the sum of $37,129.74." The direction is peremptory. There is no expression attached to instruction No. 4, such as: "Unless you find that the contract was against public policy under rules of law which I will give you in a later instruction," or anything equivalent thereto.

By instruction No. 4, the jury was categorically directed to find a verdict for the plaintiff in the specific sum of $37,129.74, if it found that he had established the three propositions therein set out. Under instruction No. 11, it could deny him any recovery whatever, *even if it found that he had established those three propositions.* After the jury had been fully instructed and retired to consider its verdict, the following occurred:

"THE COURT: You may proceed with your exceptions, gentlemen. MR. BELKNAP: The defendant excepts to Instruction No. 4, which states in so many words, that the verdict of the jury must be for the plaintiff, if the plaintiff has established three things, and makes no allowance whatsoever for the defense for illegality which the defendant presented, providing, for instance, that a part of the consideration was based on an illegal act, an act against public policy, and *practically* removes the defense of illegality from the consideration of the jury in connection with the contract, Exhibit 1." (Italics ours.)

The use of the word "practically," which we have italicized in the above quotation, makes it an understatement. "Absolutely" would have been the exact and appropriate term.

Instruction No. 11 is not only in direct conflict with instruction No. 4, but, if any instruction as to illegality was required or permissible, No. 11 was, in and of itself, confusing and inadequate. For the purpose of supporting its de-

nial that it had executed the contract sued upon, the defendant asserted, and was granted, the right to introduce evidence to the effect that the five or six years of haulage was, in fact, rendered under a very different verbal agreement. Voluminous evidence to prove that the operation was carried on under that agreement was introduced throughout the course of the trial. We cannot attempt to include it here, even in narrative form; yet, it is necessary to give a general idea of it. We think its general nature and tenor are shown from the following excerpts in respondent's brief:

"In 1936, respondent, a buying instrumentality for a number of individual grocers in Eastern Washington and Northern Idaho, interested in obtaining low freights for goods, and appellant, a truck owner and operator interested in obtaining freight to haul, entered into an agreement which was and at all times remained verbal, under which appellant hauled respondent's goods at freight rates lower than those established and required under the regulations of the Washington Public Service Commission and the U. S. Interstate Commerce Commission; that in order to accomplish such unlawful purpose by disguising the relationship of the parties, which was that of contract carrier and shipper, under the indicia of master and servant, the record title of appellant's trucks, then owned and thereafter acquired, was transferred to respondent's name; that records were kept and statements made to create the appearance that respondent owned and operated the trucks with appellant as a mere employee; that in truth and in fact, despite said deceptive practices, the trucks at all time were appellant's property, operated by him at his sole expense, and his compensation, paid and agreed to be paid, was solely for the amount of freight hauled by him from time to time based on the agreed and illegal freight rates; that said plan, adopted to circumvent the law and regulations of the State and Federal Agencies above mentioned, was followed by the parties until about the time of the commencement of this suit. . . . His [plaintiff-appellant's] actual relationship to respondent was that of contract carrier as defined by statute. However, he did not comply with the terms of the statute either by obtaining a license or by charging proper rates.

"Instead there was an attempt to hide the true relationship between the parties and to make it appear to the public that appellant was a mere employee of respondent. This

camouflage of the true relation was in evidence wherever and whenever that relationship touched the public.

"Title to the trucks used by appellant in hauling respondent's goods was registered in the name of respondent. Mr. McGonigle, who represented respondent in the initial arrangement with appellant, testified that title to appellant's trucks was thus registered in respondent's name 'to comply with the law.' He does not elaborate upon what he means by this statement 'to comply with the law.' It is evident that he must have had reference to the law classifying owners who haul their own goods in their own trucks as private carriers not subject to rules relating to conduct of common and/or contract carriers. . . .

"Registration of title to appellant's trucks in respondent's name was not the only measure adopted to make it appear to the public that respondent was hauling its own goods in its own trucks. In order to avoid trouble with the State it was necessary for respondent, in all its dealings with the public, to conduct itself as if it owned the trucks and as if appellant were a mere employee. Therefore, it paid unemployment compensation and social security charges on appellant as an employee. It paid a judgment for damages sustained in a collision with sheep caused by the negligence of appellant in operating one of these trucks. It kept the trucks insured in its name."

In instruction No. 10, the court properly instructed the jury, as follows:

"Therefore, you are instructed that if you believe from a preponderance of the evidence in this case that the written contract, Plaintiff's Exhibit No. 1, was in fact not made, or could not have been made, or that a different contract existed between the parties, then your verdict must be for the defendant."

Illegality could only be a factor in this case if the jury found that exhibit 1 was duly executed, and it cannot be too strongly emphasized that the question to be decided would then be: Should the court enforce exhibit 1? This is so, because plaintiff was endeavoring to enforce that contract, and no other. In view of the fact that the contract was in writing, it would seem that the question would be for the court, not for the jury, and, as we have hitherto seen, the court, in giving instruction No. 4, clearly treated exhibit 1 as an enforcible instrument.

On the other hand, instruction No. 11 is so worded as to make it highly probable that the jury, which had heard the iniquities of the alleged verbal agreement emphasized for days on end, got the impression that, even if it found exhibit 1 had been duly executed, if it further found that goods had been hauled under the verbal agreement for a number of years prior to making of the contract sued upon, it might allow the plaintiff only a partial recovery, or no recovery at all. We are more inclined to think that it got that impression because, even in this court, the respondent contends that that is the law. We quote from respondent's brief:

"While the purpose of the original verbal agreement of the parties was not to injure anyone else or directly enrich themselves, but rather to give hauling to appellant at a price satisfactory to him and which would reduce the price of goods to respondent's ultimate consumers, this did not alter the fact that it was contrary to express statutes of both the state and federal governments. It was therefore void and the court will not enforce any claim arising out of it."

The plaintiff, of course, was not attempting to enforce any such agreement. He was attempting to enforce exhibit 1. His claims are founded upon, and *arise out of,* that written agreement, and no other.

The directory part of instruction No. 11 reads as follows:

"Therefore, if you find from such preponderance of evidence that any part of plaintiff's claims against defendant grew out of such illegal agreement, your verdict should be for the defendant as to such illegal parts, if any, of plaintiff's claims."

There is a wide diversity of judicial opinion as to the subject under discussion. In a number of jurisdictions, it is held that, however innocent the contract on which the suit is brought may appear on its face, the defendant may go beyond it and show that it is, in fact, the culmination of an illegal transaction. On the other hand, it is said, in *Planters' Bank v. Union Bank,* 83 U. S. (16 Wall.) 483, 500, 21 L. Ed. 473:

"Some of the authorities show that, though an illegal contract will not be executed, yet, when it has been executed by the parties themselves, and the illegal object of it has

been accomplished, the money or thing which was the price of it may be a legal consideration between the parties for a promise, express or implied, and the court will not unravel the transaction to discover its origin."

It is said, in *Evans v. Dravo*, 24 Pa. St. 62, 67, 62 Am. Dec. 359:

"If a plaintiff, who has been party to a fraud, has, in order to show consideration, or for other purposes of his action, to go beyond the instrument sued on, and unravel the transaction on which it was founded, he cannot have the assistance of Courts, either of equity or law; but, where the defendant has given the plaintiff a perfect cause of action, by an instrument unimpeachable in itself, Courts are bound to sustain it, because they are not at liberty to presume it fraudulent, and the law forbids a confederate to prove it fraudulent."

Down to the semicolon in the middle of the above quotation, it expresses the law as laid down in our own cases, and we have a decision in our reports which has much of the flavor of the remainder of the paragraph:

"The trial court was of the opinion—and so are we—that appellant should not be permitted to defeat his own solemn written contract by saying that it was given solely for this fraudulent and deceitful use. He is estopped thus brazenly to assert his own covinous purpose." *Hunter v. Byron,* 92 Wash. 469, 471, 159 Pac. 703.

In the case of *McDonald v. Lund,* 13 Wash. 412, 43 Pac. 348, the admitted fact that the money claimed by the plaintiff was the actual proceeds of an illegal contract between the parties did not prevent the plaintiff from recovering. It appeared, from the agreed statement of facts, that plaintiff, defendant, and one French conducted a gambling house featuring faro and craps; that, under the contract between them, plaintiff was entitled to one half the profits, and each of the others, to one fourth thereof. From time to time a division was made on that basis. Plaintiff left the sums, to which he became entitled, with the defendant, and they were not segregated from the common fund. When the partnership was dissolved, these sums belonging to the plaintiff aggregated $431.25. The action was brought to

recover this amount, as money had and received for the plaintiff's use. We quote from the opinion:

"The court below was of the opinion that the case fell within the maxim *ex turpi causa non oritur actio*, and dismissed the action. It is conceded by the appellant that courts will decline to lend their aid to the enforcement of an executory contract which has for its object the performance of some act or the accomplishment of some end which is contrary to law or a sound public policy, and this whether the act or end contemplated by the contract is a felony or misdemeanor at law. It is conceded that the business in which these parties were engaged was an illegal one by express statutory provision. It is insisted, however, by the appellant, that this case does not fall within the rule above conceded, but within one of the limitations of such rule; that the obligation of the respondent in this case was a collateral obligation in a manner connected with or growing out of the illegal transaction, but that it is not an attempt to enforce the illegal contract; that the illegal contract had been fully executed, and that there is a new, independent and implied contract which the plaintiff will not be precluded from enforcing."

The judgment was reversed, and, since the facts were stipulated, the trial court was ordered to enter judgment for the amount prayed for; the court saying (p. 416):

"This is not a case to enforce any illegal contract, but it is to assert title to money which was accumulated under such illegal contract."

In *Central Labor Council of Tacoma v. Young*, 136 Wash. 550, 240 Pac. 919, the parties entered into a contract to operate a lottery in connection with a Labor Day celebration. The contract was clearly illegal and against public policy, lotteries being prohibited by Art. II, § 24, of the constitution, and by the terms of a statute (Rem. Comp. Stat., § 2464), both parties were punishable by imprisonment in the state penitentiary for not more than five years or by a fine of not more than one thousand dollars, or both. After the celebration was over, it was orally agreed and determined that Young had in his possession an undue share of the profits of the lottery, and owed the plaintiff $316.26 thereof. The amount not having been paid, suit was brought,

and the plaintiff recovered judgment in the trial court. On appeal, the judgment was affirmed, the court applying the rule of *McDonald v. Lund*, citing several other Washington decisions and quoting at length from the decision of the supreme court of the United States in *Planters' Bank v. Union Bank, supra.*

The case of *McDonald v. Lund* has been recognized as authoritative in *Standard Furniture Co. v. Van Alstine*, 31 Wash. 499, 503, 72 Pac. 119, and in *Daniel v. Daniel*, 116 Wash. 82, 86, 198 Pac. 728, 27 A. L. R. 177, and, together with *Central Labor Council of Tacoma v. Young* (136 Wash. 550, 240 Pac. 919), is cited in *Thomas v. Dower*, 162 Wash. 54, 56, 57, 297 Pac. 1094 (although both are distinguished therein), and both cases are cited and followed in *Donahoe v. Pratt*, 190 Wash. 103, 108, 66 P. (2d) 873. They have also been cited, with a long list of cases from other courts, in support of the decision of the court of civil appeals of Texas in *Massachusetts Bonding & Ins. Co. v. Gottlieb*, 1 S. W. (2d) (Tex. Civ. App.) 431, 432. The *Central Labor Council* decision is accepted as sound law in *Wakefield v. Hughes*, 149 Wash. 135, 137, 270 Pac. 299:

"Even though the first contract was void, the second was, nevertheless, a valid undertaking. In *Central Labor Council of Tacoma v. Young*, 136 Wash. 550, 240 Pac. 919, it was held that the illegality of a contract for the sale of coupon tickets entitling purchasers to chances on prizes and constituting a lottery was no defense to an action to recover from one of the parties involved a share of the proceeds, where the parties met and determined the amount due, the defendant agreeing to pay his associates a certain sum in final settlement. While the facts are different, the rule of that case is applicable to the present. There there was, first, an illegal contract; and subsequently, an agreement to divide the proceeds which was a valid contract."

█ It is, therefore, apparent that the state of our law governing the matter under discussion is substantially the same as set out in the following quotation from *Teich v. Chicago*, 298 Ill. 498, 501, 131 N. E. 605, 606:

*"Although, in fact, equally culpable with appellant, appellee was entitled to recover if he could show that right*

*without relying on and proving the illegal contract set up
in the special plea.* He could not have recovered if he had
had to rely on and prove the illegal and void contract set
up in the special pleas. A party to such an illegal contract
cannot recover by proving such illegal contract and the
carrying out of the same by him, for the simple reason that
courts will not lend their sanction and aid to such illegal
contracts by allowing one to recover thereon. (*Kearney v.
Webb,* 278 Ill. 17.) *In a case where such a party can show
a right of recovery without relying on the illegal contract
and without having the court sanction the same he may re-
cover in any appropriate action. It is also well established
that the defendant cannot defeat the plaintiff's right of
action by setting up the illegal contract, which was really
the actual foundation of plaintiff's claim."* (Italics ours.)

As we have seen, it is the rule in this state that a plaintiff
may recover a sum of money from a defendant who has
acknowledged that it belongs to plaintiff even if that sum
be plaintiff's share of the profits of some illegal business
or transaction in which both were engaged and equally
culpable. This is so because the plaintiff, in such a situation,
need prove nothing illegal, but has only to prove that the
defendant has acknowledged the sum sued for to belong
to him, and the court will then, as a matter of law, imply
the promise to pay.

In this case, implication is not even required. The
plaintiff sues upon a written acknowledgment of the de-
fendant that it owes him $22,129.74 on one account and
$15,000 on another, which sums, in the same instrument
(exhibit 1), it promises to forthwith pay if it discharges
the plaintiff before September 22, 1946. The defendant
having denied that the contract was executed by Roeders,
the court instructed the jury, in instruction No. 4, that
plaintiff would be entitled to recover the sum sued for if
he established:

"1. That said contract was executed by said E. H.
Roeders;

"2. That said E. H. Roeders had actual or apparent au-
thority to act for and bind said defendant as its agent with
reference to the subject-matter of said contract;

"3. That he was discharged, or that defendant by its acts

rendered it impossible for him to further continue as truck manager for defendant."

That instruction was sound, and, in effect, in giving it, the court ruled, as a matter of law, that exhibit 1 was legal and enforcible, and it was error to subsequently instruct the jury that it should decide whether the court ought to enforce it or not. Clearly, the plaintiff could make the proof required in instruction No. 4 without relying on a previous, illegal contract (if there was one), or upon the proof of any transactions with the defendant prior to the date of execution of exhibit 1. If the defendant executed exhibit 1, past illegal transactions or agreements were wholly imaterial, and, of course, if defendant did not execute exhibit 1, they were immaterial; for plaintiff sued on that contract, and no other.

The foregoing is sufficient to show that a new trial must be granted, but, in spite of the length to which this opinion has grown, we feel that we should discuss at least one other instruction, lest an inference that we think it correct might be drawn from our failure to do so. We refer to instruction No. 8:

"If you find from a preponderance of the evidence that Mr. Roeders' true signature appears on said Plaintiff's Exhibit No. 1, but without his knowledge and without an intent on his part to make such a contract, then your verdict must be for the defendant."

This instruction undisputably relates to defendant's second affirmative defense, which alleges:

"If his name [Roeders'] was in fact subscribed by him to plaintiff's Exhibit A, such signature was obtained by plaintiff through fraud, trick or device, in form and manner to defendant unknown, and without any intention on his part of executing said instrument as an agreement binding upon the defendant, even had he authority to do so."

When we consider instruction No. 8, it becomes apparent that the jury's verdict for the defendant may have been arrived at on any one of three theories: (1) that, even if the contract was executed by Roeders, it was illegal and void; (2) that it was not in fact executed by Roeders; and (3)

that it was, but not with the intention of contracting, because his signature was obtained through "fraud, trick or device."

We cannot set out Roeders' evidence as to his signature on the contract at length, but we think that it can be fairly said to amount to this: It looks like my signature, but it can't be because I never saw that contract.

■ The evidence that Roeders' signature on the instrument is genuine is, to our minds, so preponderant over Roeders' somewhat evasive testimony that it is not, that we cannot conceive how ten out of the twelve jurors who heard it and examined the four signatures Roeders wrote in their presence and his admittedly genuine signatures on other documents, and compared them with the signature on the instrument, could have found his signature to have been forged, especially since an expert of fifty years' experience testified that all of the signatures, including that on exhibit 1, could only have been made by the same person and were made by the same person, and explained at length the reason for his conclusions. Under these circumstances, the inclusion of instruction No. 8 was of the greatest value to the defendant corporation. In fact, this instruction put it in a novel and advantageous position. It *would* receive the jury's verdict if the jury found that Roeders did *not* sign exhibit 1, and it *could* receive that same verdict if it found that he did.

■■ While we think instruction No. 8 is faulty as to the matter of intent, we need not enter that technical field; for the giving of the instruction constituted prejudicial error for a more obvious reason: Under the pleadings in this case, if the jury found that Roeders' true signature appeared on exhibit 1, it could only find that this was without his knowledge and without his consent, by first finding that "such signature was obtained by plaintiff through fraud, trick or device," as alleged in defendant's second affirmative defense. As that allegation was denied, the defendant had the burden of proof. We are able to state, with complete confidence, that, although the transcript of the oral evidence is nearly a thousand pages in length, it does not contain

a single scrap of testimony tending to prove that Roeders' signature was obtained by fraud.

We have not been able to find any such evidence, and respondent has not only failed to cite any, but, on the contrary, has tacitly admitted in this court that there is none. In replying to this claim of error, respondent says, in its brief:

"Appellant makes some contention that there was no proof of fraud or trickery in connection with the execution of Exhibit 1. If, however, signatures appear upon Exhibit I, concerning the appearance of which on said Exhibit, both Mr. Roeders and Mr. Vawter have no knowledge, then there is not only a presumption, but, indeed, an absolute conclusion that the signatures must have been placed there by fraud or trickery. . . . There could be no other explanation but that of fraud or trickery under the circumstances shown by the evidence, if the signatures be held genuine."

Could not Mr. Roeders have forgotten that he saw exhibit 1, or is there a further presumption that his memory is infallible?

If there be such presumptions as are relied on by respondent, which we gravely doubt, they must certainly give way to the ancient and familiar rule—or rather, maxim, for it is so classified in the law books—that: "Fraud is never presumed, but must be proved." The Roman version is perhaps the better, for, in two less words, it not only states the maxim, but also the reason on which it is based: *"Fraus est odiosa et non proe sumenda"* (Fraud is odious and not to be presumed).

"It follows from the rule that fraud will not be presumed that the burden of proving fraud rests on the party who relies on it either for the purpose of attack or defense.

"The rules which impose the burden of proof on one alleging fraud and which deny a presumption of fraud rest on the fact that fraud is regarded as criminal in its essence, and involves moral turpitude at least, while, on the other hand, the presumption is that all men are honest, that individuals deal fairly and honestly, that private transactions are fair and regular, and that participants act in honesty and good faith. The presumption is against the existence of

fraud and in favor of innocence, *the presumption against fraud approximating in strength the presumption of innocence of crime.*" (Italics ours.) 37 C. J. S. 398, Fraud, § 94.

No evidence whatever having been introduced tending to prove the allegation that Roeders' signature was obtained by fraud, trick, or device, there was no basis upon which the jury could be instructed that it could find that it was written by him without intention to contract.

"It has been repeatedly held by this court that, where the trial court, in submitting the case to the jury, submits an issue about which there *is* no controversy, *or upon which there is no substantial testimony,* such instruction is prejudicially erroneous. *Child v. Hill,* 149 Wash. 468, 271 Pac. 266; *Burge v. Anderson,* 164 Wash. 509, 3 P. (2d) 131. Other cases to the same effect might be cited, but there is no occasion here to multiply the citation of authorities upon a proposition which is definitely settled." (Italics ours.) *Stokes v. Magnolia Milling Co.,* 165 Wash. 311, 313, 5 P. (2d) 339.

The judgment appealed from is reversed and a new trial granted.

BLAKE, MILLARD, SIMPSON, and MALLERY, JJ., concur.

